22 P.3d 1004

STATE of Hawai'i Plaintiff–Appellee,

v.

Ernest APAO, Jr., Defendant–Appellant.

No. 21991.

Intermediate Court of Appeals of Hawai'i.

May 3, 2000.

Certiorari Granted May 30, 2000.

Rose Anne Fletcher, on the briefs, Kaneohe, for defendant-appellant.

Caroline M. Mee, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee.

BURNS, C.J., WATANABE and LIM, JJ.

Opinion of the Court by LIM, J.

Defendant–Appellant Ernest Apao, Jr. (Defendant) appeals the September 18, 1998 judgment of the first circuit court convicting him in Count I of the included offense of Unlawful Imprisonment in the Second Degree and in Count II of the charged offense of Terroristic Threatening in the Second Degree, and sentencing him to concurrent one-year terms of probation, each under condi-

tions including a six-month term of imprisonment.

We vacate the judgment of convictions and probation sentences because the trial court did not instruct the jury that before it could convict the Defendant of an offense, it must unanimously agree as to the underlying facts supporting the conduct element of the offense, as required by the Hawaiʻi Supreme Court in *State v. Arceo,* 84 Hawaiʻi 1, 928 P.2d 843 (1996).

## I. Background.

On June 13, 1997, Defendant was charged via complaint in the first circuit court with Kidnapping under Count I and with Terroristic Threatening in the Second Degree under Count II:

> COUNT I: On or about the 31st day of May, 1997, in the City and County of Honolulu, State of Hawaii, ERNEST APAO, JR. did intentionally or knowingly restrain PAULETTE PEREZ, with intent to inflict bodily injury on her, thereby committing the offense of Kidnapping, in violation of Section 707–720(1)(d) of the Hawaii Revised Statutes.[1]

> COUNT II: On or about the 31st day of May, 1997, in the City and County of Honolulu, State of Hawaii, ERNEST APAO, JR. threatened, by word or conduct, to cause bodily injury to PAULETTE PEREZ, in reckless disregard of the risk of terrorizing said PAULETTE PEREZ, thereby committing the offense of Terroristic Threatening in the Second Degree, in violation of Section 707–717(1) of the Hawaii Revised Statutes.[2]

(Footnotes added).

In the first jury trial in this case, in May 1998, Defendant was convicted of the

---

1. Hawaiʻi Revised Statutes (HRS) § 707–720(1)(d) (1993) provides, in pertinent part:

   (1) A person commits the offense of kidnapping if the person intentionally or knowingly restrains another person with intent to:

   . . . .

   (d) Inflict bodily injury upon that person[.]

   HRS § 707–700 (1993) provides, in relevant part, that " '[r]estrain' means to restrict a person's movement in such a manner as to interfere substantially with the person's liberty: (1) [b]y means of force, threat, or deception[,]" and that

" '[b]odily injury' means physical pain, illness, or any impairment of physical condition."

2. HRS § 707–717(1) (1993) provides:

   A person commits the offense of terroristic threatening in the second degree if the person commits terroristic threatening other than as provided in [HRS] section 707–716 [terroristic threatening in the first degree].

   HRS § 707–715(1) (1993) provides, in relevant part, that "[a] person commits the offense of terroristic threatening if the person threatens, by word or conduct, to cause bodily injury to anoth-

charged offense of Terroristic Threatening in the Second Degree under Count II, but the jury could not reach a unanimous verdict as to count I so the trial court declared a mistrial on that count.

In the second jury trial of August 1998, Defendant was convicted under Count I of the included offense of Unlawful Imprisonment in the Second Degree, in violation of Hawai'i Revised Statutes (HRS) § 707–722.[3]

We are somewhat hampered in our review of the first trial in this case, because the transcript of the testimony of the complaining witness, Paulette Perez (Paulette), taken in its entirety on May 19, 1998, was not designated and so is not in the record on appeal. The oversight may have occurred because a May 19, 1998 transcript was designated and is contained in the record. It is, however, a partial transcript containing the testimony of another witness taken on that day. *See* Record on Appeal; First Supplemental Record on Appeal; Second Supplemental Record on Appeal.

■ Normally, "[m]atters not appearing in the record will not be considered by the court of appeals, unless the occurrence thereof is conceded by the parties. Thus a question involving evidence not in the record cannot be reviewed on appeal." *Orso v. City & County of Honolulu,* 55 Haw. 37, 38, 514 P.2d 859, 860 (1973) (internal quotation marks and citation omitted).

■ Concession of the parties includes, however, cross-admissions in the briefs on appeal. *State v. Apao,* 59 Haw. 625, 627–28, 586 P.2d 250, 254 (1978) ("Although the transcript of the grand jury hearing leading to this indictment has not been included as part of the record on appeal and is not before us, the briefs of appellee and appellant agree as to the following facts and we accept the facts as admissions.") (footnote omitted). *See also City & County v. Toyama,* 61 Haw. 156, 158 n. 1, 598 P.2d 168, 169 n. 1 (1979).

■ The opening brief of the Defendant and the answering brief of the State each contain a comprehensive and detailed account of Paulette's testimony at the first trial. The accounts agree in every relevant respect and we accept them as admissions. We do not hesitate to take this expedient because the State and the Defendant do not disagree on appeal about the pertinent evidence or the issue it raises.

As presented in the State's answering brief, Paulette's testimony at the first trial, presenting her version of the incident, crystallized the essential evidence germane to this appeal.

On May 31, 1997, the Defendant, fresh from a spell of imprisonment and angry at his ex-girlfriend Paulette over assorted grievances, among them that she had taken up with a new man and had ceased contact with Defendant during his confinement, called her on the telephone while she was at the Kaneohe residence of her new boyfriend.

Afraid of what might ensue, Paulette left the residence with her boyfriend, James, who dropped her off at a Kaneohe bus stop before taking refuge at his mother's house a few blocks away. While she was waiting for the bus, Defendant came by in a car driven by his friend Solomon.

Defendant got out of the car and commenced a rage. Defendant was yelling and swearing at Paulette, punching, slapping and grabbing her in an attempt to get her in the car.

Paulette resisted, holding on to a pole. According to Paulette, Defendant said, "I kill you now. I wanna kill you now." And he said, "[G]et up. We're going in the car. We're going back to [James's] house." Slapping her and pulling on her hair, Defendant taunted, "Run to that phone and try see if I no break your neck before you halfway. Go ahead, run."

Defendant continued in the same apoplectic vein, threatening to break her neck and her nose. He went to the car and appeared to put something under his shirt. When a

---

er person ... in reckless disregard of the risk of terrorizing[ ] another person[.]"

**3.** HRS § 707–722(1) (1993) provides that "[a] person commits the offense of unlawful imprisonment in the second degree if the person knowingly restrains another person."

police car arrived, Defendant held Paulette by her hair behind her head and warned, "[Y]ou try even say something, you try, you're dead meat. Kiss your kids goodbye. Kiss your family goodbye. You're fucking dead meat, Paulette." Paulette felt something pushed against her back and Defendant said, "I going shoot you. You going die, bitch."

After the policeman left without intervening, Defendant resumed his violent tirade, telling Paulette it was her last day and vowing, "I'll just get the jack out of the car and I'll just crack your head open now if you don't get your ass in that car." Defendant then grabbed Paulette by her hair and began pulling her toward the car. A bus pulled up and Paulette broke away, but Defendant grabbed her by the hair again and shoved her into the car.

At the Defendant's direction, Solomon drove to James's residence. On the way, Defendant continued to assault Paulette, saying, "[J]ust kiss it goodbye, Paulette, because we're going to [James's] house. I'm going to kill you in front of James. Then I going kill James. Or it sounds better if I kill James first, then you."

When they got to James's house, Defendant dragged Paulette out of the car by her hair and shoved her into the house and upstairs into the room of one of James's housemates, Lee. Along the way, Paulette would fall, but Defendant would continue to drag her in his caveman style.

As Defendant resumed his assault of Paulette in the room, Lee told him he was calling the police, whereupon Defendant grabbed Paulette's hair again, dragged her out of the room and threw her down the stairs. Renewing his hold on her hair, Defendant dragged Paulette outside to the car and pushed her in.

There ensued a series of attempts by Paulette to get out and clear of the car and efforts by Defendant to keep her in. Defen-

dant vowed, "[T]he next time you fucking move, your neck come off your shoulders." Defendant told Solomon, "[L]et's go[,]" but Solomon had seen enough and refused to take further part. At that point, the police arrived and Paulette finally escaped to safety.

Defendant and the State agree, and our review of the briefs and transcripts confirms, that the second trial in this case featured the same witnesses, each of whose testimony was virtually identical in all relevant respects to his or her testimony at the first trial.

## II. Discussion.

■ The evidence we have summarized reveals that the jury in the first trial heard evidence that the Defendant made numerous discrete threats of bodily injury to Paulette.

That evidence also confirms that the jury in the second trial considered testimony that in several discrete instances, the Defendant restrained Paulette, ostensibly and at least in part in aid of assaulting her.

These circumstances, relied upon by the Defendant, and acknowledged by the State on appeal, when considered in conjunction with the single charge of Kidnapping in Count I and the single charge of Terroristic Threatening in Count II, present the problem distilled in *Arceo, supra.*

In *Arceo*, the trial revealed evidence of multiple acts of both sexual penetration and sexual contact within the context of only two counts, one charging a single act of sexual penetration and the other charging a single act of sexual contact. *Arceo,* 84 Hawai'i at 5, 928 P.2d at 847.

The supreme court acknowledged the possibility there of verdicts not grounded in jury unanimity as to the specific act committed, and held that such verdicts, without jury unanimity as to each material element of the offense,[4] would violate the defendant's right to a fair trial under article I, section 14 of the

4. "The elements of an offense are such (1) conduct, (2) attendant circumstances, and (3) results of conduct, as: (a) Are specified by the definition of the offense, and (b) Negative a defense...." HRS § 702-205; "[N]o person may be convicted of an offense unless the following are proved

beyond a reasonable doubt: (a) Each element of the offense[.]" HRS § 701-114; *State v. Nobriga,* 10 Haw.App. 353, 358, 873 P.2d 110, 113 (1994) (the State's burden is to prove each element of the charged offense beyond a reasonable doubt).

Hawai'i State Constitution and his right to due process under article I, section 5 of the Hawai'i State Constitution. *Arceo*, 84 Hawai'i at 30–33, 928 P.2d at 872–75.

Arceo's prophylactic holding required that, under such circumstances implicating the right to a unanimous jury verdict, (1) the prosecution must elect the specific act upon which it will rely to establish the conduct element of the offense, or (2) the trial court must give the jury a specific unanimity instruction.

In this case, the State did not expressly elect under either count the specific act upon which it would rely to establish the conduct element of the offense. Indeed, in the first trial the prosecutor argued multiple threats, each as a possible basis for the Terroristic Threatening charge in Count II:

> So why would you have any reason to doubt her when she says at that bus stop he was threatening her repeatedly?
>
>     . . . .
>
> Is there any reason to believe, based on this behavior, in every other part of that day that he wasn't threatening her and punching her and slapping her around at that bus stop?
>
>     . . . .
>
> Let's talk about the bus stop. Paulette said that the defendant said just so much stuff she couldn't even remember everything. She said that he said he could— would kill her, break her neck, crack her head, get a jack hammer and split her head, shoot her, she's going to die bitch, slapping her face and head, trying to get her to—he said to her when the officer came and when the bus came, you try go, bitch, you dead meat.
>
>     . . . .
>
> There's no doubt in this case that he was threatening her and forcing her to be with him.

And in the second trial, the prosecutor argued multiple instances of restraint, each as a possible basis for the Kidnapping (or included Unlawful Imprisonment in the Second Degree) charge in Count I:

> This doesn't require Kidnapping to have occurred over two hours twenty minutes. It doesn't take any time frame at all.
>
> So if you believe at any point in this or feel that she was restrained because of his force and threats, the State would submit, ladies and gentlemen, that's Kidnapping beyond a reasonable doubt.
>
>     . . . .
>
> If you think during five minutes of this ordeal she didn't have the freedom to go where she wanted to go, do what she wanted to do because of his force and threats, that's Kidnapping.
>
>     . . . .
>
> Work back and decide:
>
> Was Paulette under her own free will when she was pulled from the house?
>
> Was she under her own free will when she was pushed down the stairs?
>
> Was she under her own free will when she was thrown up the stairs?
>
> Was she under her own free will when she was made to go into the house at all?
>
> Was she under her own free will when she was pulled into the house?
>
> Was she under her own free will when she was driven to that house the second time?
>
> Was she under her own free will being in that car at all?
>
>     . . . .
>
> Was she under her own free will at the bus stop?

Nor can it be said that the State made an implied or "effective" election of a specific underlying act under count I or count II. As indicated by the testimony summarized and arguments quoted above, the State fully developed the facts necessary to establish an offense under either count I or count II with regard to each of the multiple instances of restraint or threat, respectively. *See, e.g., State v. Maumalanga*, 90 Hawai'i 58, 63–64, 976 P.2d 372, 377–78 (1998) (though the trial court did not give a specific unanimity instruction where two discrete instances of conduct could have supported conviction under a single charge, the prosecution "made an effective election" of one of the instances

of conduct when it made no attempt to develop evidence supporting conviction based on the other).

Absent an election of any kind by the State, under *Arceo* a specific unanimity instruction must be given.

In this case, the trial court did not propound a specific unanimity instruction. Neither party requested such an instruction. The record is devoid of any reference to a specific unanimity instruction.

The absence of a specific unanimity instruction is the sole issue the Defendant presents on appeal. The State does not deny that the issue is at least presented as to both counts under the evidence and circumstances of this case.

■ When we review issues concerning jury instructions, "the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading[.]" *Maumalanga*, 90 Hawai'i at 62, 976 P.2d at 376 (internal quotation marks and citations omitted).

■ Error in jury instructions is "presumptively harmful and . . . a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial." *Id.* (internal quotations marks and citations omitted). In other words, if upon the record as a whole there is a reasonable possibility that the error may have contributed to a conviction, that conviction must be set aside. *Id.* at 62–63, 976 P.2d at 376–77.

As a preliminary matter, we observe that the Defendant in this case did not move for a bill of particulars identifying which specific act the State was relying upon under each count. Hawai'i Rules of Penal Procedure (HRPP) Rule 7(g).[5] He neither requested a specific unanimity instruction nor objected to its absence in the instructions given by the trial court to the jury.

HRPP Rule 52(b) states, however, that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

Hence we have recognized that where a defendant "did not request . . . an instruction and did not object to the court's failure to so instruct, the question is whether it was 'plain error' for the court not to have given the instruction argued for by [d]efendant on appeal." *State v. Casipe*, 5 Haw.App. 210, 220, 686 P.2d 28, 36 (1984) (citations omitted). Answering the question, we held that "plain error may be found, on appeal, where (1) there are errors in the jury instructions and (2) it is shown that substantial rights of the defendant may have been affected." *Id.* (citations omitted).

■ We turn then, to the question whether the jury instructions in this case were insufficient and therefore erroneous because the trial court did not give the jury a specific unanimity instruction.

The State advances a single argument on appeal. As to both counts, the State contends that "even though the [D]efendant committed several acts, as a matter of law, those acts constituted a single, indivisible course of conduct. . . . As a result, far from the separate, distinct criminal acts present in *Arceo*, in the instant case, Defendant engaged in a single continuous course of . . . conduct against [Paulette]. As a result, unanimity instructions were not required."

In support of this argument, the State cites HRS § 701–109(1)(e) (1993), in pertinent part:

(1) When the same conduct of a defendant may establish an element of more than one offense, the defendant may be prosecuted for each offense of which such conduct is an element. The defendant may not, however, be convicted of more than one offense if:

. . . .

(e) The offense is defined as a continuing course of conduct and the defen-

5. Hawai'i Rules of Penal Procedure Rule 7(g) provides that "[t]he court may direct the filing of a bill of particulars. A motion for a bill of particulars may be made before arraignment or within 10 days after arraignment or at such other later time as the court may permit. A bill of particulars may be amended at any time subject to such conditions as justice requires."

dant's course of conduct was uninterrupted, unless the law provides that specific periods of conduct constitute separate offenses.

By its very terms, however, HRS 701–109(1) addresses the situation in which a defendant's conduct, whether it be a discrete act or a continuing course of conduct, may establish an element of more than one offense, thus raising the possibility that the defendant may be convicted of more than one offense for what is justly and conceptually a single instance of culpable conduct.

Properly understood, HRS § 701–109(1) "reflects a policy to limit the possibility of multiple convictions and extended sentences when the defendant has basically engaged in only one course of criminal conduct directed at one criminal goal, or when it would otherwise be unjust to convict the defendant for more than one offense." Commentary on HRS § 701–109.

The cases the State cites in support of its argument address the same problem, that of multiple convictions based upon what is justly and conceptually a single instance of culpable conduct. *State v. Castro*, 69 Haw. 633, 653–54, 756 P.2d 1033, 1047–48 (1988); *State v. Hoopii*, 68 Haw. 246, 250–52, 710 P.2d 1193, 1196–97 (1985) (in which the defendant-appellant relied in part upon the continuing-course-of-conduct exception of HRS § 701–109(1)(e)).

In contradistinction, the problem in *Arceo* was and in our case is the possibility of jury divergence between or among multiple instances of culpable conduct underlying a single conviction.

The two problems are diametric opposites, and like trains passing the momentum of one cannot affect that of the other. Hence the State's argument speeds quite past the *Arceo* problem in this case.

We note in addition that the State in *Arceo* made the same argument it makes in this case, that there is no need for a jury unanimity instruction where a single, continuing course of conduct is involved. The argument was rejected by the supreme court on the way to its holding. *Arceo*, 84 Hawai'i at 12–23, 928 P.2d at 854–65.

We recognize that in order to reject that argument, the supreme court held that the sexual assaults charged in *Arceo* could not be continuing offenses under the law, and in doing so relied upon the interpretation of statutes and case law in the sexual assault context. We acknowledge also that in doing so, the supreme court noted by the way that the rubric of continuing offenses includes "under certain circumstances, kidnapping[.]" *Id.* at 18, 928 P.2d at 860.

We believe, nonetheless, that *Arceo*'s rejection of the continuing-course-of-conduct argument can be legitimately exported out of its sexual assault context into more general commerce.

For in order to reject the argument we need not necessarily decide in any particular case that the specific offense involved is not a continuing offense under the law. We may in many cases reject the argument for a more generic reason having little to do with the nature of the offense charged.

For example and assuming arguendo that kidnapping and terroristic threatening are continuing offenses under the law, under each count in this case, any continuing course of prohibited conduct conceived of can be broken down into a number of discrete culpable acts. The evidence summarized and arguments quoted above show multiple, discrete instances of restraint under count I and multiple, discrete instances of threat under count II.

■ Under each count then, it was the jury's prerogative to believe that some instances occurred and that some did not. *State v. Stocker*, 90 Hawai'i 85, 90, 976 P.2d 399, 404 (1999) (it is the province of the trier of fact to pass upon the credibility of the witnesses and to weigh the evidence).

This prerogative, in turn, produced the possibility that the jurors could diverge in identifying the parameters of the continuing course of prohibited conduct. Under count I, for example, some of the jurors could have believed that the Defendant continuously restrained Paulette only while at the bus stop, while others could have concluded that he

continuously restrained her only while at James's house.

All jurors having concluded that he restrained her continuously at some time and location or other, the jury could quite accurately report that it was unanimous in finding that the State had established the continuing course of conduct element of the offense under count I, without necessarily agreeing unanimously upon the same course.

But this is simply and again the *Arceo* problem, this time writ large over different courses of conduct rather than different instances of conduct.

Thus even if we assume that the Kidnapping offense under Count I and the Terroristic Threatening offense under Count II are both continuing offenses under the law, a specific unanimity instruction was still required in order to preclude the problem identified in *Arceo*.

In positing the possibility of jury divergence over the facts in this case, we are not engaging in mere and idle speculation.

With respect to our exemplar above, we observe that the State presented corroborating testimony from several witnesses to the events at James's house. In contrast, only Paulette testified to the State's version of the events at the bus stop. Indeed, one of the State's witnesses to the bus stop incident, Honolulu Police Department Officer Grant Kaneyuki, testified that he was sent by dispatch to the bus stop on a "domestic argument-type case." Upon arrival he saw Paulette and the Defendant seated on the bus stop bench and Solomon sitting in the car nearby. He spoke to Solomon, who told him the couple was having an argument. He saw no injuries on Paulette and nothing otherwise amiss. He twice addressed Paulette, who twice assured him she was all right. Then he left.

In both trials, the Defendant arrayed a number of witnesses to testify on his behalf. Most significant on Defendant's behalf was the eyewitness testimony of his driver, Solomon, who denied that Defendant ever assaulted, threatened or unlawfully restrained Paulette at any time or place that day. Apparently his testimony created a certain impression, because the State spent the foremost part of its closing argument in both trials attacking his credibility. In its closing argument in the first trial, the State as much as conceded that Solomon was a formidable witness for the defense:

Ladies and gentlemen, the evidence in this case shows that it's Solomon Silva that's lying. He's slick. He's smart. He's smooth. He's maybe even a little bit likable.

But you know what?

He's not telling you the truth.

### III. Conclusion.

We cannot conclude, therefore, that sheer strength of the State's evidence precluded divergent factual findings amongst the jurors as to the conduct element of the offenses, whether the conduct element be construed as a continuing course of conduct or a discrete instance (or instances) of conduct.

On the contrary, the overall tenor of the evidence in both trials convinces us that the substantial rights of the Defendant protected by the *Arceo* prophylaxis may have been affected by the trial court's error. *Arceo*, 84 Hawai'i at 30–33, 928 P.2d at 872–75 (lack of jury unanimity as to each material element of the offense would violate a criminal defendant's rights to due process and a fair trial under article I, sections 5 and 14, respectively, of the Hawai'i State Constitution).

Hence we take notice, as plain error, of error not brought to the attention of the trial court. *Casipe*, 5 Haw.App. at 220, 686 P.2d at 36. *Cf. Arceo*, 84 Hawai'i at 33, 928 P.2d at 875 (insofar as the trial court neither required the State to elect the culpable conduct it intended to rely upon for conviction nor gave the jury a specific unanimity instruction, "*Arceo*'s substantial constitutional right to unanimous jury verdicts was preju-

diced in such a manner as to give rise to plain error[ ]").

By the same token, and due to the opacity of jury deliberations, Hawai'i Rules of Evidence (HRE) Rule 606(b);[6] *State v. Larue,* 68 Haw. 575, 578–79, 722 P.2d 1089, 1042–43 (1986) (because of the HRE Rule 606(b) prohibition against receipt of evidence of jurors' mental processes during deliberations, the supreme court concluded it was impossible to say beyond a reasonable doubt that a juror's improper remark was harmless), we must assume a very real and reasonable possibility that this plain error may have contributed to the convictions of the Defendant in this case, which must therefore be set aside. *Cf. Arceo,* 84 Hawai'i at 33, 928 P.2d at 875 (concluding without discussion that "we cannot say that there was no reasonable possibility that the circuit court's error contributed to Arceo's convictions[ ]").

### IV. Disposition.

For all of the foregoing reasons, we vacate the September 18, 1998 judgment of convictions and probation sentences and remand for a new trial, under Count I on the included offense of Unlawful Imprisonment in the Second Degree, HRS § 701–110(1); *State v. Feliciano,* 62 Haw. 637, 643–45, 618 P.2d 306, 310–11 (1980), and under count II on the offense charged, consistent with this opinion.

---

**6.** Hawai'i Rules of Evidence Rule 606(b) provides that "[u]pon an inquiry into the validity of a verdict or indictment, a juror may not testify concerning the effect of anything upon the juror's or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. Nor may the juror's affidavit or evidence of any statement by the juror indicating an effect of this kind be received."