24 P.3d 32

STATE of Hawai'i, Petitoner–Appellee,

v.

Ernest APAO, Jr., Respondent–Appellant.

No. 21991.

Supreme Court of Hawai'i.

May 29, 2001.

**441**

Caroline M. Mee, Honolulu, Deputy Prosecuting Attorney, for plaintiff-appellee-petitioner, on the writ.

David A. Fisher, Deputy Public Defender, for defendant-appellee-respondent, in opposition.

MOON, C.J., LEVINSON, NAKAYAMA, RAMIL, and ACOBA, JJ.

Opinion of the Court by MOON, C.J.

Pursuant to Hawai'i Revised Statutes (HRS) § 641–13 (1993),[1] plaintiff-appellee-petitioner State of Hawai'i (the prosecution) timely applied for a writ of certiorari to review the decision of the Intermediate Court of Appeals (ICA) in *State v. Apao*, 95 Hawai'i 357, 22 P.3d 1004 (2000). Following a first circuit court jury trial, defendant-appellant-respondent Ernest Apao, Jr. was found guilty of one count of terroristic threatening in the second degree in violation of HRS § 707–717(1) (1993);[2] the jury could not reach a unanimous verdict with respect to a separate count of kidnapping in the first degree, in violation of HRS § 707–720(1)(d)

(1993).[3] Following a second jury trial on the kidnapping charge only, Apao was found guilty of the lesser included offense of unlawful imprisonment in the second degree, in violation of HRS § 707–722 (1993).[4] The trial court entered a single judgment of conviction and sentence for both counts on September 18, 1998.

Apao appealed from the trial court's judgment, arguing that the court failed to give the necessary unanimity instruction as required by *State v. Arceo*, 84 Hawai'i 1, 928 P.2d 843 (1996), in each trial (*i.e.*, on each count). The ICA agreed with Apao and vacated the conviction and sentence and remanded the case for a new trial. *Apao*, 95 Hawai'i at 358, 365, 22 P.3d at 1005, 1012. The ICA based its determination in part on its conclusion that continuing offenses "can be broken down into a number of discrete culpable acts," thereby requiring "a specific unanimity instruction ... to preclude the problem identified in *Arceo*." *Apao*, 95 Hawai'i at 363, 22 P.3d at 1010.

In its application for certiorari, the prosecution contends that the ICA erred in concluding that unanimity is required as to each aspect of conduct in a continuing offense. For the reasons that follow, we agree. Accordingly, we reverse the ICA and affirm Apao's conviction and sentence.

## I.  BACKGROUND

The factual basis for Apao's convictions is contained in two separate trial records. As such, and because the disposition of this ap-

1. HRS § 641–13 provides in relevant part that:
   An appeal may be taken by and on behalf of the State from the district or circuit courts to the supreme court ...

   . . . .
   (5) From a ruling on a question of law adverse to the State where the defendant was convicted and appeals from the judgment[.]

2. HRS § 707–717(1) provides that "[a] person commits the offense of terroristic threatening in the second degree if the person commits terroristic threatening other than as provided in section 707–716 [ (defining terroristic threatening in the first degree) ]." HRS § 707–715(1) (1993) defines terroristic threatening as follows:
   A person commits the offense of terroristic threatening if the person threatens, by word or conduct, to cause bodily injury to another per-

son or serious damage to property or another or to commit a felony ... [w]ith the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person[.]

3. HRS § 707–720(1)(d) provides that "[a] person commits the offense of kidnapping if the person intentionally or knowingly restrains another person with intent to ... [i]nflict bodily injury upon that person or subject that person to a sexual offense[.]"

4. HRS § 707–722(1) provides that "[a] person commits the offense of unlawful imprisonment in the second degree if the person knowingly restrains another person."

peal necessarily is dependant upon the facts *as presented at trial,* the specific testimony and factual details established at the respective trials are provided within the relevant portions of this opinion. The following is a synopsis of general background facts that are contained in both trial records.

On May 31, 1997, Apao, just released from imprisonment and apparently angry at his ex-girlfriend, Paulette Perez, for acquiring a new boyfriend and ceasing contact with Apao during his confinement, called the Kane'ohe residence of Perez's new boyfriend, James. Perez answered the phone.

Apparently afraid of what might ensue, Perez left the residence with James, who dropped her off at a Kane'ohe bus stop. Shortly thereafter, Apao arrived at the bus stop in a car driven by his friend, Solomon. Apao got out of the car in a rage and began yelling and swearing at Perez, punching, slapping, and grabbing her in an attempt to get her into the car. Perez resisted, holding on to a pole.

At one point, a police car stopped at the bus stop and spoke to Solomon, still seated in the car. While the police officer was there, but apparently in a manner that would not alert the officer, Apao threatened Perez and warned her not to say anything. After the police officer left without intervening, Apao resumed his violent tirade and continued to attempt to get Perez into his car. Then, a bus pulled up; Perez attempted to break away from Apao, but failed. Apao shoved her into the car.

At Apao's direction, Solomon drove to James's residence, while Apao continued to assault and threaten Perez on the way. When they arrived at James's house, Apao dragged Perez out of the car by her hair and shoved her into the house, up the stairs, and into a room. Apao then shoved her down the stairs and outside where he forced her into the car again, which was followed by numerous attempts by Perez to get out of the car and Apao's efforts to keep her in. Finally, the police arrived, and Perez escaped to safety.

On June 13, 1997, the prosecution brought charges against Apao of kidnapping and ter-

roristic threatening in the second degree. A jury trial began on May 14, 1998. The trial court's charge to the jury on May 22, 1998 included only a general unanimity instruction (*i.e* ., "your verdict must be unanimous"). The parties did not object to the instructions as read, nor did Apao request any specific unanimity instructions. During deliberations, which began May 22, 1998 and continued through June 17, 1998, the jury forwarded seven communications to the court concerning its inability to reach a unanimous verdict on the kidnapping charge or the lesser included offense of unlawful imprisonment (Count I). On June 17, 1998, the jury returned a guilty verdict on the terroristic threatening charge (Count II), but was unable to reach a unanimous verdict on Count I. Based on the jury's inability to come to a unanimous decision with regard to Count I, the court declared a mistrial as to that count. At the request of defense counsel, who was required to report for National Guard duty the following day, the court continued sentencing to "the next trial date." No judgment was entered with respect to Count II at that time.

The second trial on the kidnapping charge began on August 12, 1998, with a different jury but the same trial judge. At the close of trial, the jurors were instructed, generally, that they must be unanimous as to the verdict. Again, neither party objected to the general unanimity instruction as read, nor did Apao request a more specific unanimity instruction. On August 24, 1998, the jury returned a verdict of guilty of the lesser included offense of unlawful imprisonment in the second degree. On September 18, 1998, the trial court entered one judgment reflecting the guilty verdicts on counts I and II from each of the two trials and sentenced Apao to concurrent terms of one year of imprisonment on each count.

Apao timely appealed, arguing that, because the prosecution presented evidence of, and argued that Apao committed, multiple threats and acts, the trial court was required to instruct the jury that unanimity was required as to the underlying criminal act for each charged offense.

On May 3, 2000, the ICA, in a published opinion, noted that it was "somewhat hampered in [its] review of the first trial ... because the transcript of the testimony of [Perez] ... was not in the record on appeal." *Apao*, 95 Hawai'i at 359, 22 P.3d at 1006. Nonetheless, the ICA determined it could decide the issues presented based on the facts as "agreed" upon by the parties. *Apao*, 95 Hawai'i at 359–360, 22 P.3d at 1006–1007. The ICA concluded that, "in the first trial, the prosecutor argued multiple threats, each as a possible basis for the [t]erroristic [t]hreatening charge[,]" and that, "in the second trial, the prosecutor argued multiple instances of restraint, each as a possible basis for the [k]idnapping charge[.]" *Id.* at 361, 22 P.3d at 1008. Further, the ICA stated that, "assuming arguendo that kidnapping and terroristic threatening are continuing offenses under the law, under each count in this case, any continuing course of prohibited conduct conceived of can be broken down into a number of discrete culpable acts." *Apao*, 95 Hawai'i at 363, 22 P.3d at 1010. Based on the facts of the case (presumably established at each of the two trials), the ICA held that, even if the offenses charged were continuing offenses, a specific unanimity instruction was required in order to preclude the problem identified in *Arceo*. *Apao*, 95 Hawai'i at 363–364, 22 P.3d at 1010–1011. Accordingly, the ICA vacated Apao's convictions and sentence and remanded the case for a new trial. *Apao*, 95 Hawai'i at 365, 22 P.3d at 1012.

On May 18, 2000, the prosecution filed an application for a writ of certiorari, which we granted on May 30, 2000. In its application, the prosecution argued that the ICA erred in determining that a specific unanimity instruction was required even for a continuing offense.

Subsequent to our grant of certiorari in this case, two other relevant decisions were filed. The first, *State v. Kealoha*, 95 Hawai'i 365, 22 P.3d 1012,[5] was filed on May 17, 2000, by the ICA and held that unanimity was not required in a drug manufacturing case because "[the defendant's] conduct of manufac-

turing methamphetamine constituted a single, continuous offense and not 'separate and distinct culpable acts.'" *Kealoha*, 95 Hawai'i at 367, 22 P.3d at 1014 (quoting *Arceo*, 84 Hawai'i at 32, 928 P.2d at 874). Because the prosecution perceived the ICA's disposition in *Kealoha* to be in direct conflict with its disposition in *Apao*, the prosecution filed a Motion for Permission to File Supplemental Brief, which we granted on June 7, 2000. Both the prosecution and Apao filed supplemental briefs.

The second relevant case filed subsequent to the grant of certiorari in this case was *State v. Hoang*, 93 Hawai'i 333, 3 P.3d 499 (2000), filed on July 10, 2000, which held that, where the factual basis of an alleged point of error is not made part of the record on appeal (*i.e.*, a defendant fails to include the relevant transcript), this court has no basis upon which to rule on the merits of the claim. *Id.* at 336, 3 P.3d at 502. On July 18, 2000, Apao filed a motion to supplement the record on appeal with the "Partial Transcript of Proceedings" from May 19, 1998 (containing the testimony of Perez during the first trial), which we granted.

## II. STANDARDS OF REVIEW

### A. Jury Instructions

"When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading[.]" *State v. Kinnane*, 79 Hawai'i 46, 49, 897 P.2d 973, 976 (1995) (quoting *State v. Kelekolio*, 74 Haw. 479, 514–15, 849 P.2d 58, 74 (1993) (citations omitted)).

"[E]rroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial." *State v. Pinero*, 70 Haw. 509, 527, 778 P.2d 704, 716 (1989) (quoting *Turner v. Willis*, 59 Haw. 319, 326, 582 P.2d 710, 715 (1978)).

---

5. This court granted certiorari in *Kealoha* on June 23, 2000. Upon further examination, we subsequently dismissed certiorari as improvi-

dently granted. *See State v. Kealoha*, No. 22384, Order Dismissing Certiorari as Improvidently Granted (May 18, 2001).

[E]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error may have contributed to conviction.

State v. Heard, 64 Haw. 193, 194, 638 P.2d 307, 308 (1981) (citations omitted). If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside. See Yates v. Evatt, 500 U.S. 391, 402–03 [111 S.Ct. 1884, 1892–93, 114 L.Ed.2d 432] (1991)[.]

State v. Arceo, 84 Hawai'i 1, 11–12, 928 P.2d 843, 853–54 (1996) (quoting State v. Holbron, 80 Hawai'i 27, 32, 904 P.2d 912, 917, reconsideration denied, 80 Hawai'i 187, 907 P.2d 773 (1995) (some citations omitted) . . . (emphasis deleted))[.]

State v. Valentine, 93 Hawai'i 199, 204, 998 P.2d 479, 484 (2000) (some citations omitted) (internal brackets and ellipses omitted).

B. *Statutory Interpretation*

Questions of statutory interpretation are questions of law reviewable de novo. *Valentine*, 93 Hawai'i at 204, 998 P.2d at 484 (citations omitted).

Our statutory construction is guided by the following well-established principles:

[O]ur foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. . . .

In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) [ (1993) ]. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

*Gray[ v. Administrative Director of the Court]*, 84 Hawai'i [138,] 148, 931 P.2d [580,] 590 [ (1997) ]. This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it ... to discover its true meaning." HRS § 1–15(2) (1993). "Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." HRS § 1–16 (1993).

*Valentine*, 93 Hawai'i at 204, 998 P.2d at 484 (citing *State v. Kotis*, 91 Hawai'i 319, 327, 984 P.2d 78, 86 (1999)) (other citations and ellipses omitted).

C. *Plain Error*

"We may recognize plain error when the error committed affects substantial rights of the defendant." *Arceo*, 84 Hawai'i at 33, 928 P.2d at 875. Moreover, "it may be plain error for a trial court to fail to give an ... instruction even when neither the prosecution nor the defendant have requested it ... because ... 'the ultimate responsibility properly to instruct the jury lies with the circuit court and not with trial counsel.' " *Arceo*, 84 Hawai'i at 33, 928 P.2d at 875 (quoting *State v. Kinnane*, 79 Hawai'i 46, 50, 897 P.2d 973, 977 (1995) (quoting *State v. Kupau*, 76 Hawai'i 387, 395, 879 P.2d 492, 500 (quoting *Briones v. State*, 74 Haw. 442, 473, 848 P.2d 966, 980 (1993) (Levinson, J., concurring)))) (internal quotation signals added) (ellipses in original).

*Valentine*, 93 Hawai'i at 205, 998 P.2d at 485 (some citations and ellipses omitted).

### III. *DISCUSSION*

A. *Unanimity with respect to continuing offenses*

Apao argues on appeal that a specific unanimity instruction was required under *State*

*v. Arceo*, 84 Hawai'i 1, 928 P.2d 843 (1996). In *Arceo*, this court held that,

> when separate and distinct culpable acts are subsumed within a single count . . . — any one of which could support a conviction thereunder—and the defendant is ultimately convicted by a jury of the charged offense, the defendant's constitutional right to a unanimous verdict is violated unless one or both or the following occurs: (1) at or before the close of its case-in-chief, the prosecution is required to elect the specific act upon which it is relying to establish the "conduct" element of the charged offense; or (2) the trial court gives the jury a specific unanimity instruction, *i.e.*, an instruction that advises the jury that all twelve of its members must agree that the same underlying criminal act has been proved beyond a reasonable doubt.

*Arceo*, 84 Hawai'i at 32–33, 928 P.2d at 874–75. As we have previously explained,

> the *Arceo* decision dealt with a situation in which the prosecution had adduced evidence regarding independent incidents, during each of which the defendant engaged in conduct that could constitute the offense charged, and each of which could have been, but were not, charged as separate offenses. [*Arceo*, 84 Hawai'i] at 21–22, 928 P.2d at 863–64. Inasmuch as these independent instances of culpable conduct were submitted to the jury in a single count that charged but one offense, we held that a specific unanimity instruction was necessary to ensure that each juror convicted the defendant on the basis of the same incident of culpable conduct. *Id.* at 32–33, 928 P.2d at 874–75.

*Valentine*, 93 Hawai'i at 208, 998 P.2d at 488.

In *Arceo*, this court also defined a "continuing offense" as

> a continuous, unlawful act or series of acts set on foot by a single impulse and operat-

ed by an unintermittent force, however long a time it may occupy, or an offense which continues day by day, or a breach of the criminal law, not terminated by a single act or fact, but subsisting for a definite period and intended to cover or apply to successive similar obligations or occurrences. Put differently, the test to determine whether a defendant intended to commit more than one offense in the course of a criminal episode is whether the evidence discloses one general intent or discloses separate and distinct intents. If there is but one intention, one general impulse, and one plan, there is but one offense.

*Arceo*, 84 Hawai'i at 18, 928 P.2d at 860 (internal citations and brackets omitted). In construing the phrase "continuing offense," we also noted that the parameters of "continuing" offenses are circumscribed by HRS §§ 701–108(4) (1995), 701–109(1)(e) (1993), and 701–118(4).[6] *Arceo*, 84 Hawai'i at 18, 928 P.2d at 860.

As stated previously, the ICA, in the case before us, concluded that "any continuing course of prohibited conduct conceived of can be broken down into a number of discrete culpable acts" and, thus, even assuming an offense is a continuing offense, "a specific unanimity instruction is still required." *Apao*, 95 Hawai'i at 363, 22 P.3d at 1010. This statement of law, however, not only contradicts the ICA's opinion in *Kealoha*, *see supra* note 5, filed two weeks after *Apao*, but is also contrary to this court's opinions in *Arceo*, *Valentine*, and *State v. Rapoza*, 95 Hawai'i 321, 22 P.3d 968 (2001).

In *Arceo*, we explained that "construing . . . [an offense] as simultaneously constituting [a] continuing and distinct offense[ ] would inevitably generate the very evils rendered unlawful by [the rule established in *State v.] Modica[*, 58 Haw. 249, 567 P.2d 420

---

**6.** HRS § 701–118(4) (1993) defines "conduct" to mean "an act or omission, or *where relevant*, a series of acts or a series of omissions, or a series of acts and omissions[.]" (Emphasis added). Thus, a discrete offense may consist of "a series of acts" when "[t]he offense is defined as a continuing course of conduct" that is "uninterrupted," as distinguished from statutes providing "that specific periods of conduct constitute sepa-

rate offenses." *See* HRS § 701–109(1)(e) (1993) (proscribing method of prosecution when conduct establishes an element of more than one offense). *See also* HRS § 701–108(4) (1997) ("An offense is committed either when every element occurs, or, if a legislative purpose to prohibit a continuing course of conduct plainly appears, at the time when the course of conduct . . . is terminated.").

(1977).]"[7] *See Arceo*, 84 Hawai'i at 22, 928 P.2d at 864. To allow the prosecution to elect whether to charge a Defendant with multiple acts or one continuous offense violates the defendant's rights to due process and equal protection because "the same acts committed under the same circumstances could, by virtue of the prosecution's charging option or whim, be punishable as either a single offense or as multiple offenses, even though the proof essential to either result would be exactly the same." *Id*. Based on that principle alone, we believe the conduct of a defendant can either represent *"separate and distinct culpable acts"* or an *uninterrupted* continuous course of conduct, but not both.

In *Arceo*, because the definition of sexual assault precluded the consideration of separate acts of penetration as a continuing course of conduct,[8] we held that separate and distinct culpable acts were alleged and, thus, unanimity was required. 84 Hawai'i at 30–33, 928 P.2d at 872–75.

In contrast, we held in *Valentine* that a specific unanimity instruction was not required because the defendant's acts of reaching for, clasping of, and tugging on an officer's firearm constituted only a single episode between Valentine and the police officer and was, therefore, a continuing course of conduct. 93 Hawai'i at 208–09, 998 P.2d at 488–89. Moreover, as we later pointed out in *Rapoza*, "the offense of attempted prohibited possession of a firearm, of which Valentine was convicted . . . [is not] defined in such a manner as to preclude the prosecution from proving that the requisite conduct element was committed by a series of acts constituting a continuous course of conduct." *Rapoza*, 95 Hawai'i at 329, 22 P.3d at 976.

Likewise, in *Rapoza*, we explained that the definition of the offenses of attempted second degree murder, attempted first or second degree assault, or first degree reckless endangering, as to which Rapoza was tried, did not "preclude the prosecution from proving that the requisite conduct element was committed by a series of acts constituting a continuous course of conduct." *Id*. Accordingly, we held that Rapoza's multiple discharges of the firearm constituted a single continuous offense as to each complainant. In so holding, we explained that

> the danger present in *Arceo*—*i.e.*, jury confusion regarding the facts constituting the conduct element of an offense—does not arise where the prosecution alleges that the defendant committed but one offense, adduces evidence that the defendant engaged in a series of acts constituting a continuous course of conduct, and argues that the requisite conduct element is satisfied by the defendant's continuous conduct, albeit that the defendant's continuous course of conduct may be divisible into conceptually distinct motor activity.

*Id*. Unanimity was, therefore, not required.

Finally, in *Kealoha*, the relevant offense was a violation of HRS § 712–1240, which prohibits the manufacturing of a dangerous drug. The ICA noted that,

> by its nature, manufacturing of a dangerous drug may be a single continuous offense. The general character of "manufacturing" connotes a continuing "process" of various steps or stages. In its ordinary sense, "manufacture" is "the process or operation of making goods or any material produced by hand, by machinery or by other agency."

*Kealoha*, 95 Hawai'i at 376, 22 P.3d at 1023. Thus, the ICA held that manufacturing under HRS § 712–1241(1)(d) may be proved as a continuing offense. The evidence in *Kealoha* demonstrated that the manufacturing of methamphetamine occurred at the same place and for a continuous period of time

---

7. The rule in *Modica* is described as follows:
   [W]here the same act committed under the same circumstances is punishable either as a felony or as a misdemeanor . . . and the elements of proof . . . are exactly the same, a conviction . . . [as a felony] would constitute a violation of the defendant's rights to due process and equal protection of the laws.

*Modica*, 58 Haw. at 251, 567 P.2d at 421–22 (citations omitted).

8. HRS § 707–700 (1993) provides, *inter alia*, that "[f]or purposes of this chapter, each act of sexual penetration shall constitute a separate offense."

preceding the arrest. The prosecutor did not portray the defendant's conduct as comprising "separate and distinct culpable acts" of manufacturing methamphetamine nor emphasize any specific conduct upon which "the jury could find from the evidence that [the defendant] committed a single charged offense on two or more distinct occasions." *See id.* at 32–33, 928 P.2d at 874–75 (citations omitted). Hence, the ICA correctly determined that a specific unanimity instruction was not required.

■ Based on the foregoing, we hold that Apao's conduct can either represent *"separate and distinct culpable acts"* or an *uninterrupted* continuous course of conduct, but not both. We also hold that a specific unanimity instruction is not required if (1) the offense is not defined in such a manner as to preclude it from being proved as a continuous offense and (2) the prosecution alleges, adduces evidence of, and argues that the defendant's actions constituted a continuous course of conduct. *See Rapoza,* 95 Hawai'i at 329–330, 22 P.3d at 976–977.

Accordingly, the ICA erred in holding that a specific unanimity instruction is required *even if* the offenses charged were continuing offenses. Consequently, we next examine the relevant statutes and the evidence at trial to determine whether the offenses in this case were continuing offenses.

## B. *Terroristic Threatening*

■ As a preliminary matter, we note that the ICA decided the unanimity issue with respect to the terroristic threatening charge notwithstanding the fact that the transcript testimony of Perez, the complaining witness, was not made part of the record on appeal. In *State v. Hoang,* 93 Hawai'i 333, 3 P.3d 499 (2000), we vacated an ICA opinion on the grounds that the appellant had failed to supply a necessary transcript. Our decision was based on the proposition that, where the factual basis of an alleged point of error is not made part of the record on appeal, this court has no basis upon which to rule on the merits of the claim. *Id.* at 336, 3 P.3d at 502. In this case, the determination whether a jury was required to unanimously determine which specific threat or conduct constituted terroristic threatening is dependant upon the facts as presented at trial. The transcript of Perez's testimony was essential to the issue on appeal, and the ICA erred in disposing of that point without it. However, because Apao has since supplemented the record with the missing transcript, thereby providing us with a basis upon which to address the merits of the claim, we need not vacate the ICA opinion on those grounds. We, therefore, next examine the merits of the point of error on appeal with respect to terroristic threatening.

Apao contends that the jury should have been instructed that it must unanimously determine which specific act constituted terroristic threatening because "the evidence presented by the prosecution ... included allegations of several separate and distinct acts of threatening conduct, each of which could support a conviction[.]"

> A person commits the offense of terroristic threatening if the person threatens, by word or conduct, to cause bodily injury to another person or serious damage to property or another or to commit a felony ... [w]ith the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person[.]

HRS § 707–715(1).

■ Unlike the sexual assault offense at issue in *Arceo,* nothing in the statutory definition of terroristic threatening, or the penal code in general, precludes the prosecution from proving that the required conduct element was committed by a series of acts constituting a continuing course of conduct. Rather, the very nature of threatening conduct connotes a combination or series of words and/or actions that together constitute a threat. Thus, if the prosecution presented the evidence at trial as one continuous uninterrupted course of conduct, then no specific unanimity instruction would be required.

■ With respect to Apao's conviction of terroristic threatening, the facts established at trial were as follows. When Apao first encountered Perez at the bus stop, he began a tirade of threats by both word and conduct to cause bodily injury to Perez. His threats included statements to the effect that he

would kill her, shoot her, break her nose, break her arm, break her back and break her neck. All of Apao's threats were made to induce Perez to get into the car and to restrain her. At no point between the time Apao arrived at the bus stop until Perez was in the safety of the police at the Kane'ohe residence was Perez not being threatened by Apao's words and conduct. The record demonstrates that the multiple threats constituted a continuous uninterrupted series of acts.

Apao contends that, because HRS § 707–716(1)(a) (1993) provides that "[a] person commits terroristic threatening in the *first* degree ... [b]y threatening another person **on more than one occasion for the same or a similar purpose**," terroristic threatening in the *second* degree (with which Apao was charged and convicted) cannot be a continuing offense. However, Apao's argument fails inasmuch as the incident that resulted in his conviction did not occur on "more than one occasion." Rather, it was one uninterrupted occasion during which Apao made multiple verbal and physical threats.[9]

Apao also contends that the prosecution invited the jury to "pick among the many different threats" by emphasizing each individual threat in closing. Apao's contention is without merit. Even though the prosecution reminded the jury of each individual threat, the prosecution never argued that Apao's series of acts constituted more than one intention, impulse, or plan; nor did the prosecution argue that Apao committed more than one continuous crime. *See Rapoza*, 95 Hawai'i at 329–330, 22 P.3d at 976–977 (holding that unanimity is not required "where the prosecution alleges that the defendant committed but one offense, adduces evidence that the defendant engaged in a series of acts constituting a continuous course of conduct, and argues that the requisite conduct element is satisfied by the defendant's continuous conduct, albeit that the defendant's continuous course of conduct may be divisible into conceptually distinct motor activity").

Based on the foregoing, we hold that Apao's conduct, as alleged and proved by the

prosecution, constituted a continuing course of conduct "set on foot by a single impulse and operated by an unintermittant force," with "one general intent ... and one [continuous] plan." *See Arceo*, 84 Hawai'i at 18, 928 P.2d at 860. Consequently, a specific unanimity instruction was not required.

### C. *Unlawful imprisonment*

In his second point on appeal, Apao contends that the jury should have been instructed that it must unanimously determine which specific act constituted unlawful restraint in the second degree because "the evidence in the [second trial] ... provided several separate and distinct acts which on [their] own ... could have supported a [conviction for unlawful imprisonment]."

■ "A person commits the offense of unlawful imprisonment in the second degree if the person knowingly restrains another person." HRS § 707–722(1). " 'Restrain' means to restrict a person's movement in such a manner as to interfere substantially with the person's liberty ... by means of force, threat, or deception[.]" HRS § 707–700 (1993). Again, nothing in the statutory definition of the offense precludes the prosecution from proving that the restraint was accomplished by a series of acts constituting a course of conduct. It is not difficult to imagine a series of threats and coercive conduct that might be employed to sustain a kidnapping or unlawful restraint over a period of time. Moreover, this court has previously stated that, under certain circumstances, kidnapping would be an example of a continuing offense. *See Arceo*, 84 Hawai'i at 18, 928 P.2d at 860.

■ The facts established at the second trial, in which Apao was charged with kidnapping and convicted of unlawful imprisonment in the second degree (a lesser included offense), demonstrated that from the time that Apao began threatening Perez at the bus stop to get her into his car against her will until the time Perez escaped to the safety of the police officers when they arrived at

---

9. The fact that the prosecution charged Apao with second, as opposed to first, degree terroristic threatening further supports the view that the prosecution viewed Apao's actions as constituting one continuous course of conduct.

the Kaneʻohe residence, Apao was restricting her movement and substantially interfering with her liberty. Moreover, he was using multiple instances of force and threats to accomplish that goal.

Apao contends that the evidence demonstrated that he restrained Perez "continuously for several distinct periods." Although it is unclear what is meant by the foregoing description, Apao adds that "there was also evidence that these periods were interrupted by periods of liberty or that the restraint did not occur until later in the incident." In support of that contention, Apao explains that Perez testified that she escaped briefly from Apao's control when the bus arrived. The testimony from Perez on this point was as follows:

[Perez]: Then I seen the bus come. The bus pulled right in the back of [Solomon's] car. To me it's the only chance that I can—I was thinking I can get up, walk to the car, but then run towards the bus.

[Deputy Prosecutor]: What happened?

[Perez]: He grabbed—he grabbed me. I counted to three again. So I stood up. And he had me by the arm and walking towards the car. And then *I tried* to push away from him to get to the bus. But then he grabbed me by the hair again and told me you try and move I'm going to break your neck right now. And I just stood there looking toward the bus.

[Deputy Prosecutor]: What happened next?

[Perez]: Hopefully, the bus driver would have seen me or something. I don't know if she seen me. Then I—walking away towards the bus he kept on shoving me to the car.

[Deputy Prosecutor]: Did he get you in the car?

[Perez]: Yes. He finally kicked me behind and I fell to the ground and he pushed me into the car. I was on my hands and knees crawling into the car.

[Deputy Prosecutor]: Did you want to get in the car?

[Perez]: No.

(Emphasis added). Absolutely nothing in the foregoing testimony suggests that Perez escaped (even briefly) when the bus pulled up.

Apao also points to the testimony of Officer Kaneyuki, the police officer who had pulled up to the bus stop, to show that some of the jurors might have believed Perez was not restrained at the bus stop. Officer Kaneyuki testified that, when he arrived at the bus stop to investigate an anonymous tip regarding an argument between a man and a woman, he did not witness anything amiss. Moreover, Officer Kaneyuki testified that he asked Perez twice whether she was alright and both times she replied "yes." Perez's testimony did not contradict Officer Kaneyuki's testimony. Perez testified as follows:

[Deputy Prosecutor]: What happened next?

[Perez]: He kept on intimidating swearing at me calling me names. Say, you know, what it is sitting down be in prison.[10] I go break you nose for that. I'm going to kill you right here.

And, few occasions had some cops that would pass by. He would tell me run. He would tell me [Perez], go ahead, run for the cops, [Perez]. Go ahead. See if you're not going to be dead meat right now.

He would nudge me to go. Run. Go ahead. Go run. Right there get the telephone number do nothing. He dare to go. And he would tell me I know how to break a person's neck. I can break your fu— break your neck right here and nobody would even know.

[Deputy Prosecutor]: When he nudged you and he dared you to go, did you go?

[Perez]: No.

[Deputy Prosecutor]: Why not?

[Perez]: I was scared.

. . . .

---

10. Perez testified earlier that both she and Apao believed she was responsible for his having to return to prison. Although not entirely clear from the record, Apao appears to have been re-incarcerated based on his failure to complete a treatment program, which he voluntarily left when he was discovered with love letters from Perez, a fellow patient at the time, in violation of the program's rules.

[Deputy Prosecutor]: You said something about a police officer coming. Tell us what happened at that point.

[Perez]: After he came with the thing up under his shirt,[11] he sat by me and the police pulled right across the street from where he was and he came and he talked to [Solomon]. He didn't come to us, you know. I believe someone saw us some kind of commotion and called that cop because there was other cops passing by.

He pulled up on the side and see directly what was wrong. He spoke to Sol. I don't know what he was saying. But at the same time [Apao] was saying if I move, he was going to break my neck. He going kill me. He did like that to me. Go. Go ahead. Right now. Go. Run. Go ahead so I can kill you. Let me have a reason for kill you.

[Deputy Prosecutor]: Did you move?

[Perez]: I didn't move. I was too scared.

Based on Perez's and Kaneyuki's testimony, it is clear that Perez did not believe she was at liberty to leave when the police officer drove up. Moreover, there was no evidence that the police officer's arrival interrupted or terminated Apao's criminal conduct. Thus, Apao's continuous act of restraint, at least by threat, was not interrupted.

Finally, Apao argues that the prosecution expressly invited the jury to view Apao's various acts as separate and distinct in his closing argument by telling the jurors that, "if you believe [at] *any point* in this ... that she was restrained because of his force and threats, the State would submit ... that's Kidnapping beyond reasonable doubt[.]" Even though the prosecution focused the jury's attention on multiple threats and conduct, each of which may have been conceptually distinct, the prosecution presented the series of acts as having constituted a single continuing course of conduct—*i.e.*, one offense. *See Rapoza*, 95 Hawai'i at 329–330, 22 P.3d at 976–977. Specifically, the prosecutor went through each and every one of Apao's

threats and acts on that day during closing argument and then stated:

> [T]his is a *continuing course of conduct* ... [Apao's] rage was in place when he threatened to bring a gun back to the house when he left the first time [after discovering that Perez was no longer at the Kane'ohe residence]. It's still in progress when he goes to the bus stop for that hour. He keeps it in check just long enough so officer Kaneyuki doesn't suspect anything then he forces her in the car and takes her back there looking for confrontation with her and James and nobody at that point says anything other than Solomon but that he's in a blind rage, evil maniac. He's incoherent. He's raging to such an extent.

In rebuttal argument, the prosecutor again emphasized that

> the incident as we know it started at that time and it went what, perhaps an hour and a half, hour and three quarters. We know at least there was an hour between the two different times Officer Kaneyuki saw [Perez] at the two different places and she was at the bus stop under her own guess about half a hour, 45 minutes before the officer ever came.
>
> This doesn't require Kidnapping to have occurred over two hours twenty minutes. It doesn't take any timeframe at all.
>
> So if you believe any point in this or feel that she was restrained because of his force and threats, the State would submit, ladies and gentlemen, that's Kidnapping beyond a reasonable doubt.

Based on the foregoing, it is clear the prosecutor argued that Apao engaged in a series of acts constituting a continuous course of conduct and that the requisite conduct element for kidnapping (or unlawful imprisonment) was satisfied by the defendant's continuous conduct. *See Rapoza*, 95 Hawai'i at 329–330, 22 P.3d at 976–977.

11. Perez had testified that, "at one point [Apao] went to the car and then he—he was talking to Sol and took something underneath the passenger's side, put it under his shirt, then he came back to me. I guess from all the commotion and screaming that he was doing a cop came, pull up on the side."

Accordingly, we hold that Apao's conduct, as proved by the prosecution, constituted a continuing course of conduct "set on foot by a single impulse and operated by an unintermittant force" with "one general intent . . . and one [continuous] plan." *See Arceo*, 84 Hawai'i at 18, 928 P.2d at 860. As such, a specific unanimity instruction was not required.

## IV. CONCLUSION

Based on the foregoing, we vacate the ICA opinion and affirm the judgment of the first circuit court.