157 P.3d 574

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**David William Kawika AULD, Defendant–Appellant.**

**No. 27781.**

Intermediate Court of Appeals of Hawai'i.

April 17, 2007.

Pamela E. Tamashiro, Honolulu, for Defendant–Appellant.

Brandon L.K. Paredes, Deputy Prosecuting Attorney, County of Maui, for Plaintiff–Appellee.

BURNS, C.J., and FUJISE, J.; with NAKAMURA, J., concurring and dissenting separately.

## Opinion of the Court by BURNS, C.J.

Defendant–Appellant David William Kawika Auld (Auld) appeals from the December 7, 2005 Judgment,[1] based upon a jury's verdict, finding him guilty as charged on Counts One and Five, Terroristic Threatening in the First Degree, Hawaii Revised Statutes (HRS) § 707–716(1)(d) (1993), and Counts Two, Three, and Four, Assault in the Third Degree, HRS § 707–712(1)(a) (1993), and sentencing him to concurrent terms of incarceration, with credit for time served, of five years for each of Counts One and Five, and one year for each of Counts Two, Three, and Four. We vacate the December 7, 2005 Judgment with respect to Counts One and Five and remand for a new trial on those counts. We affirm in all other respects.

## EVIDENCE PRESENTED BY PLAINTIFF–APPELLEE STATE OF HAWAI'I (THE STATE)

On the island of Moloka'i, in the County of Maui, the residence located at 1820 Oki Place is owned by Adrian White, also known as Adrian Anglin (Adrian). On Monday, July 4, 2005, the following people were at the 1820 Oki Place residence: Kiana Kalima (Kiana), Salina Skylark Kansana (Salina), Kiana's mother, Liane Kalima (Liane), Liane's boyfriend, Francis Kalani Mariano (Kalani), and Adrian's cousin, Adam Anglin (Adam). Adrian is a disabled man who hired Liane to care for him. Adrian was not involved in the incident.

At approximately 4:00 p.m., Auld arrived at 1820 Oki Place in his car and parked in the driveway. Auld said he wanted to speak with Kiana and Salina. Liane called for them. Salina then approached Auld's car and spoke with him for five to ten minutes. Auld never exited his car and drove away after speaking with Salina.

About fifteen minutes later, Auld returned to 1820 Oki Place in his car and again parked in the driveway. Salina again spoke with Auld. Auld asked Salina to call Kiana because he wanted to talk to her. Auld exited his car. He was shirtless and wearing fatigue pants with a knife strapped to his back. He started walking towards the house. Salina was walking in front of Auld. Auld shoved Salina in the shoulder. When Liane asked Auld "[w]hat's going on[,]" Auld told Liane, "[d]on't interfere."

Adam went to the phone to call his uncle, who is also Auld's hānai[2] brother. Before Adam could complete the call, Auld told

---

1. Judge Joel E. August presided.

2. In this context, the Hawaiian word "hānai" means "foster". *Lealaimatafao v. Woodward–* *Clyde Consultants*, 75 Haw. 544, 553, 867 P.2d 220, 224 n. 7 (1994).

Adam to put the phone down. As Adam turned to put the phone down, Auld pulled out his knife and cut the phone line. Adam departed to find Auld's hānai brother. Upon exiting, Adam locked the driveway gate.

On the ramp at the entrance to the house in the vicinity of Liane, Salina, Kiana, and Adam, Auld loosely swung his knife around. Salina thought that someone was going to get hurt and told Auld, "[h]ey, why don't you just put away the knife[.]" Auld put the knife in his back pocket, approached Salina, and started punching her face and chest with a closed fist. When Liane grabbed Auld by his right shoulder, Auld punched Liane with a closed fist once in the mouth and twice to the left side of her head. When Kiana said, "[y]ou hit my mother[,]" Auld walked up to Kiana and started punching her face and chest.

Liane entered the house and Auld followed her. Auld told her he was sorry and that he knew her husband. As they were talking, Kiana and Salina came back inside and another scuffle followed. Auld attacked and punched both girls until Sergeant Timothy Meyer of the Maui Police Department arrived at the scene.

### EVIDENCE PRESENTED BY AULD

Auld testified that he was opening up the Hope Chapel church and ministering to Kiana and Salina, both of whom were adults. He loaned Kiana his 1985 Nissan Sentra car. He arranged for some of their meals. He loaned $100 to Salina. In Auld's words, "[w]e had all sat down and made the agreement to go to church to have fellowship, you know, and they just couldn't meet any of it." He took back the car. Kiana and Salina contacted Auld and said "that they wanted to try again so [he] said [they] need to clean this car up. They hadn't driven it for months and not done anything except drive it, eat in it, sleep in it, play in it." On the evening of Sunday, July 3, 2005, Kiana and Salina "were to go to service and receive communion and they were to dedicate themselves, be baptized" but did not appear. At lunchtime on Monday, Auld stopped at their residence "[t]o get them to finish the job for one thing and to ask them why they didn't show up at church after they made so many agreements[.]" Auld left the residence and returned at about 4:00 p.m. Although he "could see by [Salina's] body language that this was going to be something confrontational[,]" he entered the residence to talk to Salina and Kiana. He "wanted them to understand that this was going to be it and that yeah, if they needed to obligate $100, they agreed to finish the job, that they would finish the job. It would be the last job and that would be it. That would be the end of the whole relationship of pastor, minister." He passed Kalani and Liane, saw Adam getting up with something in his hand, and pushed Salina out of the way and moved toward Adam. He then saw that Adam had the phone in his hand, told him to put the phone down, and cut the phone line with the hunting knife he had in his back pocket. He was then surrounded by Kiana, Salina, Adam, Liane, and Kalani. They told him to put the knife away and he did so. While he was pointing his finger, he was hit on the head and the back shoulder and he defended himself. During a break in the altercation, he apologized to Liane. Then Kiana and Salina came at him. Salina was holding a "two-by-four." Auld responded by "putting [his] hand up blocking and throwing blows, too." By the time the police arrived, it was "kind of like a standoff[.]"

### DISCUSSION

### POINT OF ERROR NO. 1

HRS § 707–715 (1993) states in part:

**Terroristic threatening, defined.** A person commits the offense of terroristic threatening if the person threatens, by word or conduct, to cause bodily injury to another person or serious damage to property of another or to commit a felony:

(1) With the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person[.]

HRS § 707–716 (1993) states in part:

**Terroristic threatening in the first degree.** (1) A person commits the offense of terroristic threatening in the first degree if the person commits terroristic threatening:

. . . .

(b) By threats made in a common scheme against different persons; or

. . . .

(d) With the use of a dangerous instrument.

(2) Terroristic threatening in the first degree is a class C felony.

The July 15, 2005 Complaint alleged, in part:[3]

*COUNT ONE:*

That on or about the 4th day of July, 2005, in the County of Maui, State of Hawaii, DAVID WILLIAM KAWIKA AULD, with intent to terrorize, or in reckless disregard of the risk of terrorizing another person, including Salina Skylark Kansana, Kiana Kalima, and/or Liane Kalima, did threaten, by word or conduct, to cause bodily injury to another person, including Salina Skylark Kansana, Kiana Kalima, and/or Liane Kalima, with the use of a dangerous instrument, to wit, an eleven inch buck knife, thereby committing the offense of Terroristic Threatening in the First Degree in violation of Section 707–716(1)(d) of the Hawaii Revised Statutes.

. . . .

*COUNT FIVE:*

That on or about the 4th day of July, 2005, in the County of Maui, State of Hawaii, DAVID WILLIAM KAWIKA AULD, with intent to terrorize, or in reckless disregard of the risk of terrorizing Adam Anglin, did threaten, by word or conduct, to cause bodily injury to Adam Anglin with the use of a dangerous instrument, to wit, an eleven inch buck knife, thereby committing the offense of Terroristic Threatening in the First Degree in violation of Section 707–716(1)(d) of the Hawaii Revised Statutes.

Count One alleges that Auld "did threaten, by word or conduct, to cause bodily injury to another person, including Salina Skylark

Kansana, Kiana Kalima, and/or Liane Kalima[.]" In other words, Count One alleges that Auld threatened another person including one or more of the three listed or perhaps someone not listed.

In contrast, the court instructed the jury, in part, as follows:[4]

Instruction Number 22. In Count One of the complaint, [Auld] is charged with the offense of Terroristic Threatening in the First Degree.

. . . .

There are three material elements of the offense of Terroristic Threatening in the First Degree, each of which the prosecution must prove beyond a reasonable doubt.

These three elements are:

1. That on or about July 4th, 2005 in the County of Maui, [Auld] threatened by word or conduct to cause bodily injury to [Salina], [Kiana] and/or [Liane]; and

2. That [Auld] did so with the use of a dangerous instrument, specifically a knife; and

. . . .

Instruction Number 32. In Count Five of the complaint, [Auld] is charged with the offense of Terroristic Threatening in the First Degree.

. . . .

There are three material elements of the offense of Terroristic Threatening in the First Degree, each of which the prosecution must prove beyond a reasonable doubt.

These three elements are:

1. That on or about July 4th, 2005 in the County of Maui, [Auld] threatened by word or conduct to cause bodily injury to [Adam][.]

Initially, we must differentiate between a "general unanimity instruction" and a "specific unanimity instruction[.]"

---

3. Count Two of the July 15, 2005 Complaint alleged Assault in the Third Degree of Salina Skylark Kansana (Salina). Count Three alleged Assault in the Third Degree of Kiana Kalima (Kiana). Count Four alleged Assault in the Third Degree of Liane Kalima (Liane).

4. We note that, unlike Count One, this instruction limits the victims to Salina, Kiana, and/or Liane.

In *State v. Apao*, 95 Hawai'i 440, 442, 24 P.3d 32, 34 (2001), the "general unanimity instruction" was defined as follows: "At the close of trial, the jurors were instructed, generally, that they must be unanimous as to the verdict. Again, neither party objected to the general unanimity instruction as read, nor did Apao request a more specific unanimity instruction."

In *State v. Arceo*, 84 Hawai'i 1, 33, 928 P.2d 843, 875 (1996), the "specific unanimity instruction" was defined as being "an instruction that advises the jury that all twelve of its members must agree that the same underlying criminal act has been proved beyond a reasonable doubt."

Regarding this distinction, the following are the relevant precedents:

Although not arising in the context of sexual assaults committed against young children, a line of federal decisions supports a requirement that the jury be given a specific unanimity instruction under the circumstances of this case. *See United States v. Echeverry*, 719 F.2d 974, 975 (9th Cir.1983) ("When it appears ... that a conviction may occur as a result of different jurors concluding that the defendant committed different acts, the general unanimity instruction does not suffice. To correct any potential confusion in such a case, the trial judge must augment the general instruction to ensure [that] the jury understands its duty to unanimously agree to a particular set of facts."); *United States v. Payseno*, 782 F.2d 832, 836–37 (9th Cir.1986) (ruling that there was "the genuine possibility that some jurors may have believed [that the defendant] used extortionate means on one occasion while others may have believed that he was guilty of engaging in extortion at a different time and place," and that "*Echeverry* clearly sets forth the rule that we are not free to speculate about what the jurors agreed to in their ... deliberation over [the defendant's] guilt or innocence," and, accordingly, holding that "a general unanimity instruction will not suffice when the possibility of such jury confusion exists" and that the trial court committed plain error in failing to give a specific unanimity instruction); *United States v. Gilley*, 836 F.2d 1206, 1211–13 (9th Cir.1988) (reaffirming *Echeverry* and *Payseno* and holding that (1) there was "a genuine possibility that the jurors were not unanimous as to the conjunction of two of the material elements of the crime," (2) "[t]his [was] not a case where the case was sufficiently simple and clear in its presentation that unanimity [could] be assumed based on the general [unanimity] instruction," (3) "[r]ather, it [was] a case involving a sufficiently complex set of facts requiring the judge sua sponte to give a specific unanimity instruction," (4) "[b]ecause the deficiency in the trial judge's instructions prejudiced the defendant's substantial rights to a unanimous jury verdict ..., ... plain error occurred," and (5) "a conviction for conducting an illegal gambling business ... cannot stand where the guilty verdict cannot with reasonable certainty be said to stem from a unanimous verdict" (citations and quotation marks omitted)); *United States v. Anguiano*, 873 F.2d 1314, 1318–20 (9th Cir.) (reaffirming *Echeverry, Payseno*, and *Gilley* ), *cert. denied*, 493 U.S. 969, 110 S.Ct. 416, 107 L.Ed.2d 381 (1989); *United States v. Jerome*, 942 F.2d 1328, 1331 (9th Cir.1991) (reaffirming *Echeverry* and *Gilley* ).

In our view, the logic of *Petrich, Covington, Aldrich, Brown,* and the line of federal decisions arising out of *Echeverry* is cogent, compelling, and ineluctable. Accordingly, we hold that when separate and distinct culpable acts are subsumed within a single count charging a sexual assault—any one of which could support a conviction thereunder—and the defendant is ultimately convicted by a jury of the charged offense, the defendant's constitutional right to a unanimous verdict is violated unless one or both of the following occurs: (1) at or before the close of its case-in-chief, the prosecution is required to elect the specific act upon which it is relying to establish the "conduct" element of the charged offense; or (2) the trial court gives the jury a specific unanimity instruction, i.e., an instruction that advises the jury that all twelve of its members must agree that the

**140**

same underlying criminal act has been proved beyond a reasonable doubt.

*Arceo,* 84 Hawai'i at 32–33, 928 P.2d 843 at 874–75 (footnote omitted).

In *Arceo,* [the Hawai'i Supreme Court] also defined a "continuing offense" as

> a continuous, unlawful act or series of acts set on foot by a single impulse and operated by an unintermittent force, however long a time it may occupy, or an offense which continues day by day, or a breach of the criminal law, not terminated by a single act or fact, but subsisting for a definite period and intended to cover or apply to successive similar obligations or occurrences. Put differently, the test to determine whether a defendant intended to commit more than one offense in the course of a criminal episode is whether the evidence discloses one general intent or discloses separate and distinct intents. If there is but one intention, one general impulse, and one plan, there is but one offense.

*Arceo,* 84 Hawai'i at 18, 928 P.2d at 860 (internal citations and brackets omitted). In construing the phrase "continuing offense," we also noted that the parameters of "continuing" offenses are circumscribed by HRS §§ 701–108(4) (1995), 701–109(1)(e) (1993), and 701–118(4). *Arceo,* 84 Hawai'i at 18, 928 P.2d at 860.

As stated previously, the ICA, in the case before us, concluded that "any continuing course of prohibited conduct conceived of can be broken down into a number of discrete culpable acts" and, thus, even assuming an offense is a continuing offense, "a specific unanimity instruction is still required." *Apao,* 95 Hawai'i at 363, 22 P.3d at 1010. This statement of law, however, not only contradicts the ICA's opinion in *Kealoha, see supra* note 5, filed two weeks after *Apao,* but is also contrary to this court's opinions in *Arceo, Valentine,* and *State v. Rapoza,* 95 Hawai'i 321, 22 P.3d 968 (2001).

In *Arceo,* we explained that "construing ... [an offense] as simultaneously constituting [a] continuing and distinct offense[ ] would inevitably generate the very evils rendered unlawful by [the rule established

in *State v.] Modica* [, 58 Haw. 249, 567 P.2d 420 (1977).]" *See Arceo,* 84 Hawai'i at 22, 928 P.2d at 864. To allow the prosecution to elect whether to charge a Defendant with multiple acts or one continuous offense violates the defendant's rights to due process and equal protection because "the same acts committed under the same circumstances could, by virtue of the prosecution's charging option or whim, be punishable as either a single offense or as multiple offenses, even though the proof essential to either result would be exactly the same." *Id.* Based on that principle alone, we believe the conduct of a defendant can either represent "*separate and distinct culpable acts*" or an *uninterrupted* continuous course of conduct, but not both.

In *Arceo,* because the definition of sexual assault precluded the consideration of separate acts of penetration as a continuing course of conduct, we held that separate and distinct culpable acts were alleged and, thus, unanimity was required. 84 Hawai'i at 30–33, 928 P.2d at 872–75.

In contrast, we held in *Valentine* that a specific unanimity instruction was not required because the defendant's acts of reaching for, clasping of, and tugging on an officer's firearm constituted only a single episode between Valentine and the police officer and was, therefore, a continuing course of conduct. 93 Hawai'i at 208–09, 998 P.2d at 488–89. Moreover, as we later pointed out in *Rapoza,* "the offense of attempted prohibited possession of a firearm, of which Valentine was convicted ... [is not] defined in such a manner as to preclude the prosecution from proving that the requisite conduct element was committed by a series of acts constituting a continuous course of conduct." *Rapoza,* 95 Hawai'i at 329, 22 P.3d at 976.

Likewise, in *Rapoza,* we explained that the definition of the offenses of attempted second degree murder, attempted first or second degree assault, or first degree reckless endangering, as to which Rapoza was tried, did not "preclude the prosecution from proving that the requisite conduct element was committed by a series of

acts constituting a continuous course of conduct." *Id.* Accordingly, we held that Rapoza's multiple discharges of the firearm constituted a single continuous offense as to each complainant. In so holding, we explained that

> the danger present in *Arceo*—*i.e.,* jury confusion regarding the facts constituting the conduct element of an offense—does not arise where the prosecution alleges that the defendant committed but one offense, adduces evidence that the defendant engaged in a series of acts constituting a continuous course of conduct, and argues that the requisite conduct element is satisfied by the defendant's continuous conduct, albeit that the defendant's continuous course of conduct may be divisible into conceptually distinct motor activity.

*Id.* Unanimity was, therefore, not required.

Finally, in *Kealoha*, the relevant offense was a violation of HRS § 712–1240, which prohibits the manufacturing of a dangerous drug. The ICA noted that,

> by its nature, manufacturing of a dangerous drug may be a single continuous offense. The general character of "manufacturing" connotes a continuing "process" of various steps or stages. In its ordinary sense, "manufacture" is "the process or operation of making goods or any material produced by hand, by machinery or by other agency."

*Kealoha*, 95 Hawai'i at 376, 22 P.3d at 1023. Thus, the ICA held that manufacturing under HRS § 712–1241(1)(d) may be proved as a continuing offense. The evidence in *Kealoha* demonstrated that the manufacturing of methamphetamine occurred at the same place and for a continuous period of time preceding the arrest. The prosecutor did not portray the defendant's conduct as comprising "separate and distinct culpable acts" of manufacturing methamphetamine nor emphasize any specific conduct upon which "the jury could find from the evidence that [the defendant] committed a single charged offense on two or more distinct occasions." *See id.* at 32–33, 928 P.2d at 874–75 (citations omitted). Hence, the ICA correctly determined that

a specific unanimity instruction was not required.

> Based on the foregoing, we hold that Apao's conduct can either represent *"separate and distinct culpable acts"* or an *uninterrupted* continuous course of conduct, but not both. We also hold that a specific unanimity instruction is not required if (1) the offense is not defined in such a manner as to preclude it from being proved as a continuous offense and (2) the prosecution alleges, adduces evidence of, and argues that the defendant's actions constituted a continuous course of conduct. *See Rapoza*, 95 Hawai'i at 329–330, 22 P.3d at 976–977.

*Apao*, 95 Hawai'i at 445–47, 24 P.3d at 37–39 (footnotes omitted).

This court has concluded that

> Under the unanimity rule, the prosecutor must elect the specific act upon which reliance is placed "to establish the 'conduct' element of the charged offense" if evidence of "separate and distinct culpable acts" are presented in trial. *Arceo,* 84 Hawai'i at 33, 928 P.2d at 875. As a corollary to this aspect of the rule, we believe that the prosecution should designate and the court must thereafter instruct the jury on the specific conduct which constitutes a single continuous offense and upon which all members of the jury must agree in order to convict. Of course, no appealable dispute would arise were the trial courts in every case to instruct the jury that all of its members must unanimously agree to "the same underlying . . . act" or acts that constitute the conduct they find culpable under the charge, before they may find a defendant guilty.

*State v. Kealoha,* 95 Hawai'i 365, 378, 22 P.3d 1012, 1025 (App.2000). This court's *Kealoha* "corollary", however, is ignored by the Hawai'i Supreme Court's current *Apao* requirement, which states as follows:

> Based on the foregoing, we hold that Apao's conduct can either represent *"separate and distinct culpable acts"* or an *uninterrupted* continuous course of conduct, but not both. We also hold that a specific unanimity instruction is not required if (1) the offense is not defined in

such a manner as to preclude it from being proved as a continuous offense and (2) the prosecution alleges, adduces evidence of, and argues that the defendant's actions constituted a continuous course of conduct. *See Rapoza,* 95 Hawai'i at 329–330, 22 P.3d at 976–977.

*Apao,* 95 Hawai'i at 447, 24 P.3d at 39.

Granted that "an *uninterrupted* continuous course of conduct" such as manufacturing of drugs (*Kealoha*), attempted prohibited possession of a firearm (*Valentine*), or multiple discharges of a firearm (*Rapoza*) must be charged as one offense, it is not clear why the following statement does not apply:

> In our view, the logic of *Petrich, Covington, Aldrich, Brown,* and the line of federal decisions arising out of *Echeverry* is cogent, compelling, and ineluctable. Accordingly, we hold that when separate and distinct culpable acts are subsumed within a single count . . .—any one of which could support a conviction thereunder—and the defendant is ultimately convicted by a jury of the charged offense, the defendant's constitutional right to a unanimous verdict is violated unless one or both of the following occurs: (1) at or before the close of its case-in-chief, the prosecution is required to elect the specific act upon which it is relying to establish the "conduct" element of the charged offense; or (2) the trial court gives the jury a specific unanimity instruction, i.e., an instruction that advises the jury that all twelve of its members must agree that the same underlying criminal act has been proved beyond a reasonable doubt.

*Arceo,* 84 Hawai'i at 32–33, 928 P.2d at 874–75 (footnote omitted).

These precedents involved cases where a general unanimity instruction was given and the question was whether, in addition thereto, the court was required to give a specific unanimity instruction. In Auld's case, we first must determine whether the one unanimity instruction that was given is general or specific. That instruction stated:

> Instruction Number 17. The law allows the introduction of evidence for the purpose of showing that there is more than one act upon which proof of an element of an offense may be based. In order for the prosecution to prove an element, all 12 jurors must unanimously agree that the same act has been proved beyond a reasonable doubt.

We conclude that this is a specific unanimity instruction that is also the *Kealoha* "corollary".

All of the above discussion pertains to the act of the offense rather than the victim of the offense. We conclude that the holding of *Apao* applies as much (a) to the victim as it does (b) to the act. In Auld's case, the holding of *Apao* applies as much (a) to the person(s) threatened as it does (b) to the threatening conduct.

In Auld's case, jury instruction no. 22 states that one of the elements of Count One is that Auld threatened Salina, Kiana, and/or Liane. Auld contends that he "was denied due process of law to a unanimous verdict by virtue of the trial court's failure to require the prosecution to elect the particular victim(s) on whom it relied in seeking a criminal conviction and failure to give a specific unanimity instruction as to the individual(s) who was/were the victim(s) in Count 1 of the Complaint[.]"

In the answering brief, the State responds:

> [Auld's] contention is erroneous because the State presented evidence of [Auld's] threatening behavior with the knife towards [Salina], [Kiana] and [Liane], as a single criminal act, a continuing uninterrupted course of conduct, and therefore, a specific unanimity instruction was not required.

Hawai'i appellate courts have consistently held that, where the prosecution alleged and presented evidence of a single criminal offense, a continuing course of conduct, a specific unanimity instruction was not required. *See State v. Arceo,* 84 Hawai'i 1, 928 P.2d 843 (1996); *State v. Valentine,* 93 Hawai'i 199, 998 P.2d 479 (2000); *State v. Rapoza,* 95 Hawai'i 321, 22 P.3d 968 (2001); *State v. Apao,* 95 Hawai'i 440, 24 P.3d 32 (2001). In defining a single or "continuing offense," the Supreme Court of Hawai'i has enumerated the following test:

[T]he test to determine whether a defendant intended to commit more than one offense in the course of a criminal episode is whether the evidence discloses one general intent or discloses separate and distinct intents. If there is but one intention, one general impulse, and one plan, there is but one offense.

*Apao,* 95 Hawai'i at 445, 24 P.3d at 37.

... In *Apao,* the Supreme Court noted that "the very nature of threatening conduct connotes a combination or series of words and/or actions that together constitute a threat." *Id.* As such, in terroristic threatening cases, where "the prosecution presented the evidence at trial as one continuous uninterrupted course of conduct," trial courts are not required to give a specific unanimity instruction. *Id.*

... The record demonstrates that, from the time [Auld] brandished the knife and cut the phone line to the time that [Auld] put the knife away, [Auld's] threatening acts constituted a continuous uninterrupted course of conduct. [Auld] had one intention, one general impulse, one plan to terrorize everyone at the house, including Salina, Kiana, and Liane. Therefore, no specific unanimity instruction was required.

In Auld's case, the Complaint alleged in Count One, and the prosecution adduced evidence, that Auld threatened "another person, including [Salina], [Kiana], and/or [Liane][.]" No unanimity instruction was given to the jury regarding the person(s) threatened. According to the State, "as no specific unanimity instruction regarding the 'act' was required, a specific unanimity instruction regarding the 'victim' was also not required."

The State's response referring to "Salina, Kiana and Liane" ignores the facts that (a) Count One alleges that Auld threatened "another person, including [Salina], [Kiana], and/or [Liane]," and (b) both Count One and instruction no. 22 state that one of the elements of Count One is that Auld threatened Salina, Kiana "and/or" Liane.

In its opening statement, the State told the jury that Auld

assaulted four people. He assaulted [Liane], her daughter [Kiana], Kiana's friend, [Salina], and he threatened or committed terroristic threatening against all three of those women and [Adam]....

. . . .

That's what the evidence is going to show happened. You will hear testimony that he punched and pulled the hair of [Kiana], that he punched [Liane], and that he punched [Salina]. You will see evidence he pulled out the knife in the presence of Kiana, Salina and Liane, waving it at them and telling them he's going to kill them. Adam was there as well.

That's what the evidence will show, that he terrorized these people. For what reason we don't know and we don't have to prove that, but for whatever reason he terrorized this group of people that day[.]

In its closing argument, the State told the jury that Auld

returned to that house that day because he wanted Kiana and Salina to remain in his fold, to remain under his power, and they had rejected that and that made him angry and that's why he terrorized the people in that house. That's why he assaulted them, and for that reason we're asking you [to] return a verdict of guilty as charged as to all of those counts. Thank you.

■ Although the State contended and presented evidence that Auld terroristically threatened Salina, Kiana, Liane, and Adam, Count Five charged Auld with having terroristically threatened only Adam, and Count One charged Auld with having terroristically threatened Salina, Kiana "and/or" Liane. Instruction no. 22 states that one of the elements of Count One is that Auld terroristically threatened Salina, Kiana "and/or" Liane, thus permitting the jury to decide that Auld terroristically threatened Salina, Kiana, or Liane. Without any instruction requiring unanimity as to the person(s) threatened, each of the twelve jurors could have based his or her determination of guilt on a finding of the following victim alternatives: (1) Salina, Kiana, and Liane; (2) Salina and Kiana; (3) Salina and Liane; (4) Kiana and Liane; (5) Salina; (6) Kiana; or (7) Liane. Allowing each juror seven choices and not requiring

all jurors to agree on no less than one violates the rule requiring a unanimous jury regarding the person(s) threatened, which was necessary to prove the offense charged.

### POINT OF ERROR NO. 2.

■ Auld contends that his "right to have the jury properly instructed constituted plain error where the trial court failed to give a self-defense instruction as to Counts 1 and 5, the Terroristic Threatening in the First Degree counts[.]"

In light of the following precedent, we conclude that "plain error" is not the question.

The ICA [Intermediate Court of Appeals] previously attempted to implement its view of the consequences of the allocation of ultimate responsibility for jury instructions to the trial court in *State v. Astronomo*, 95 Hawai'i 76, 18 P.3d 938 (App.2001), concluding that "with respect to jury instructions, the distinction between 'harmless error' and 'plain error' is a distinction without a difference." *Id.* at 82, 18 P.3d at 944. *Accord State v. Fields*, No. 25455, ── Hawai'i ──, ── P.3d ──, ──, n. 7, 2005 WL 1274539, at 19 n. 7 (App. May 31, 2005) ("Now that this duty [to properly instruct the jury] has been imposed on the trial court, it is logical to conclude that erroneous instructions should be examined for HRPP Rule 52(a) 'harmless error' rather than HRPP Rule 52(b) 'plain error.' "), *cert. granted* 108 Hawai'i 1, 116 P.3d 7 (Haw. July 6, 2005). Based, however, on the perceived failure of this court in *State v. Iuli*, 101 Hawai'i 196, 203–04, 65 P.3d 143, 150–51 (2003), to approve *Astronomo* or affirmatively cite the duty of the trial court to properly instruct the jury, the ICA in the instant case took the view that the ultimate responsibility for jury instructions does not lie with the trial court and that it should thus apply a discretionary plain error standard of review to erroneous jury instructions. ICA's Opinion, 111 Hawai'i at 448–49, 142 P.3d at 312–13.

We now acknowledge that the ICA's earlier view was correct and adopt the substance of Chief Judge Burns' analysis in

*Astronomo* and *Fields*. Consequently, we hold that, although as a general matter forfeited assignments of error are to be reviewed under the HRPP Rule 52(b) plain error standard of review, in the case of erroneous jury instructions, that standard of review is effectively merged with the HRPP Rule 52(a) harmless error standard of review because it is the duty of the trial court to properly instruct the jury. As a result, once instructional error is demonstrated, we will vacate, without regard to whether timely objection was made, if there is a reasonable possibility that the error contributed to the defendant's conviction, i.e., that the erroneous jury instruction was not harmless beyond a reasonable doubt.

*State v. Nichols*, 111 Hawai'i 327, 141 P.3d 974 (2006) (footnote omitted).

Auld admits that his "primary defense with respect to the Terroristic Threatening charges was that he never threatened anyone with the knife." His point regarding the trial court's failure to give a self-defense instruction as to Counts One and Five is based on the fact that "the evidence presented at trial also fairly raised the issue of self-defense."

> As noted by Auld, prior to *Nichols*, Auld was entitled to a self-defense instruction where the evidence presented at trial, "no matter how weak, unsatisfactory, or inconclusive" the evidence relating to self-defense might have appeared to the trial court. *State v. Irvin*, 53 Haw. 119, 121, 488 P.2d 327, 328 (1971) (citations omitted). The trial court had the responsibility to give the self-defense instruction *sua sponte* because the evidence presented at trial fairly raised the issue. ⸱

As not noted by Auld, the rule of *Irvin* goes further:

> On the second ground, the court refused to give defendant's requested instructions on self defense on the ground that defendant had the gun and any instruction on self defense was not justified by the facts. Defendant's theory at the trial was that the killing was accidental, not that it was done in self defense. But his testimony

fairly raised the issue of self defense. That being the case, he was entitled to an instruction on that issue no matter how weak, unsatisfactory, or inconclusive the testimony might have appeared to the court. *Territory v. Alcantara,* 24 Haw. 197, 208 (1918); *State v. Chang,* 46 Haw. 22, 47, 374 P.2d 5, 18 (1962). The fact that the issue raised by the testimony was not consonant with the theory of defense makes no difference. *Womack v. United States,* 119 U.S.App.D.C. 40, 336 F.2d 959 (1964). Thus, the court's refusal of self defense instruction was reversible error.

*Irvin,* 53 Haw. at 121, 488 P.2d at 328.

If still the applicable rule, the rule of *Irvin* would have applied to this situation where, although there is evidence that Auld did threaten one or more persons with the knife and that he did so in self-defense, (1) Auld testified that he never threatened anyone with the knife, (2) counsel for Auld did not request a self-defense instruction and, (3) in his closing argument to the jury, counsel for Auld argued the following:

> There was a phone in the other room. Nobody called the cops. Nobody tries to run away. They testify that my client was waving the knife at them. He threatened to kill them. Nobody leaves. There's a gate around the house. That's why some of them said I couldn't get out of the gate. The gate is four feet tall.
>
> . . . .
>
> Now, let's look at what physical evidence we have. We have some photographs. We have got the knife. [Auld] admits to taking the knife out. If he's lying to you, why does he admit to taking the knife out? If he's going to lie to you, why don't say he never used the knife. He had it on his person and never used it.

The rule of *Irvin* was applicable prior to *Nichols* when defense counsel had some discretion about what instructions the court gave and did not give to the jury. Has *Nichols* changed the application of the rule of *Irvin?* We conclude that the answer is no. Thus, regardless of the defendant's theory of

defense, the defendant and/or the defense counsel cannot stop the court from giving to the jury a self-defense instruction that is permitted by the evidence.

The State concedes that Auld was entitled to self-defense instructions for Counts One and Five, but contends that the omission of such instructions was harmless beyond a reasonable doubt where the evidence showed that Auld voluntarily entered 1820 Oki Place residence, appeared agitated, took an aggressive tone of voice and body posture, waved a knife in front of other persons, and physically attacked them. In light of Auld's testimony, we conclude that the instructional error was not harmless beyond a reasonable doubt.

## CONCLUSION

Accordingly, we vacate the December 7, 2005 Judgment with respect to Counts One and Five, Terroristic Threatening in the First Degree, HRS § 707–716(1)(d) (1993), and remand for a new trial on Counts One and Five. In all other respects, we affirm.

### *CONCURRING AND DISSENTING OPINION BY NAKAMURA, J.*

Defendant–Appellant David William Kawika Auld (Auld) was charged in Counts 1 and 5 with first degree terroristic threatening. I agree with the majority's conclusion that the jury instructions regarding Count 1 did not adequately require unanimity as to the person threatened and therefore the conviction on that count must be vacated.[1] I disagree, however, that the trial court's failure to give a self-defense instruction not requested by the defense on the terroristic threatening charges requires vacating the conviction on Count 5. Accordingly, I respectfully dissent from the majority's decision to vacate the conviction on Count 5.

### I.

Auld requested and the trial court gave a self-defense instruction with respect to the third degree assault charges. Auld apparently made a strategic choice not to request a self-defense instruction as to the terroristic

---

1. Unlike Count 1, Count 5 only alleged that one person had been threatened. Thus, Court 5 did not present a jury unanimity issue as to the person threatened.

threatening charges. Nevertheless, he argues on appeal that the trial court committed plain error in failing to *sua sponte* give a self-defense instruction as to the terroristic threatening charges.

As the majority correctly notes, after *State v. Nichols*, 111 Hawai'i 327, 141 P.3d 974 (2006), plain error is no longer the question when it comes to erroneous jury instructions to which no objection was made. In *Nichols*, the Hawai'i Supreme Court held that

> although as a general matter forfeited assignments of error are to be reviewed under the [Hawai'i Rules of Penal Procedure] HRPP Rule 52(b) plain error standard of review, in the case of erroneous jury instructions, that standard of review is effectively merged [²]with the HRPP Rule 52(a) harmless error standard of review because it is the duty of the trial court to properly instruct the jury. As a result, once instructional error is demonstrated, we will vacate, without regard to whether timely objection was made, if there is a reasonable possibility that the error contributed to the defendant's conviction, *i.e.*, that the erroneous jury instruction was not harmless beyond a reasonable doubt.

*Id.* at 337, 141 P.3d at 984 (footnote supplied).

However, even under *Nichols*, the threshold question of whether the trial court committed instructional error remains. Obviously, the court does not breach its duty to properly instruct the jury if it omits an instruction that is not required. *Nichols* therefore still demands a determination of whether the giving or omission of an instruction to which no objection was raised constitutes error. The harmless beyond a reasonable doubt inquiry only comes into play once instructional error is demonstrated.

Hawai'i law is clear that *when requested by a defendant*, the trial court is required to give a self-defense instruction if the evidence fairly raises the issue of self-defense, regardless of "how weak, unsatisfactory, or inconclusive the testimony might have appeared to the court." *State v. Irvin*, 53 Haw. 119, 120, 488 P.2d 327, 328 (1971). This is true even if the requested self-defense instruction is inconsistent with the defendant's main theory of defense. *Id.* It is less apparent, however, whether Hawai'i law requires the trial court to instruct the jury on self-defense when the defendant for strategic reasons decides he or she does not want the instruction.

Neither party provides much helpful guidance on this issue. Both believe that there was sufficient evidence to support a self-defense instruction and assume that because Auld was entitled to request a self-defense instruction, the circuit court erred in failing to give one. Neither party offers any analysis on what effect a strategic choice by Auld not to assert self-defense and not to request a self-defense instruction with respect to the terroristic threatening charges would have on the trial court's duty to instruct.

The record supports the view that Auld made a strategic choice not to seek a self-defense instruction on the terroristic threatening charges. Prior to trial, Auld requested that the court give the Hawaii Standard Jury Instruction–Criminal (HAWJIC) Instruction No. 7.01 for self-defense.[3] The HAWJIC

---

2. In *State v. Nichols*, 111 Hawai'i 327, 141 P.3d 974 (2006), the Hawai'i Supreme Court noted that a remaining distinction between the plain error and the harmless error standards of review for jury instructions is that there is "a presumption that unobjected-to jury instructions are correct[.]" *Id.* at 337 n. 6, 141 P.3d at 984 n. 6. Accordingly, "the appellate court is under no duty to scour the record for [instructional] error *sua sponte.*" *Id.*

3. The Hawaii Standard Jury Instruction–Criminal (HAWJIC) Instruction No. 7.01 (2000) for self-defense provides as follows:

> Justifiable use of force—commonly known as self-defense—is a defense to the charge of (*specify charge and its included offense except*

those involving a reckless state of mind ). The burden is on the prosecution to prove beyond a reasonable doubt that the force used by the defendant was not justifiable. If the prosecution, [sic] does not meet its burden then you must find the defendant not guilty.

[The use of force upon or toward another person is justified when a person reasonably believes that such force is immediately necessary to protect himself/herself on the present occasion against the use of unlawful force by the other person. The reasonableness of the defendant's belief that the use of such protective force was immediately necessary shall be determined from the viewpoint of a reasonable person in the defendant's position under the circumstances of which the defendant was

Instruction No. 7.01 contains blanks in two places for the parties to specify the charges to which the self-defense instruction will apply. The trial court modified the standard

aware or as the defendant reasonably believed them to be.]

[The use of deadly force upon or toward another person is justified when a person using such force reasonably believes that deadly force is immediately necessary to protect himself/herself on the present occasion against [death] [serious bodily injury] [kidnapping] [rape] [forcible sodomy]. The reasonableness of the defendant's belief that the use of such protective force was immediately necessary shall be determined from the viewpoint of a reasonable person in the defendant's position under the circumstances of which the defendant was aware or as the defendant reasonably believed them to be.]

[The use of deadly force is not justified if the defendant, with the intent of causing death or serious bodily injury, provoked the use of force against himself/herself in the same encounter, or if the defendant knows that he/she can avoid the necessity of using such force with complete safety by retreating.]

"Force" means any bodily impact, restraint, or confinement, or the threat thereof.

"Unlawful force" means force which is used without the consent of the person against whom it is directed and the use of which would constitute an unjustifiable use of force [or deadly force.]

["Deadly force" means force which the actor uses with the intent of causing, or which he/she knows to create a substantial risk of causing, death or serious bodily injury.]

[Intentionally firing a firearm in the direction of another person or in the direction which the person is believed to be constitutes deadly force.]

[A threat to cause death or serious bodily injury, by the production of a weapon or otherwise, so long as the actor's intent is limited to creating an apprehension that he/she will use deadly force if necessary, does not constitute deadly force.]

["Bodily injury" means physical pain, illness, or any impairment of physical condition.]

["Serious bodily injury" means bodily injury which creates a substantial risk of death or which causes serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.]

[If and only if you find that the defendant was reckless in having a belief that he/she was justified in using self-protective force against another person, or that the defendant was reckless in acquiring or failing to acquire any knowledge or belief which was material to the justifiability of his/her use of force against the other person, then the use of such self-protective force is unavailable as a defense to the offense of (*any offense the requisite mental state*

instruction by filling in these blanks with "Assault in the Third Degree." The modified instruction was given by agreement of the parties.[4] It is inconceivable that Auld

*of which is either reckless or negligent conduct* ).]

[The use of force is not justifiable to resist an arrest that the defendant knows is being made by a police officer, even if the arrest is unlawful. On the other hand, if the police officer threatens to use or uses unlawful force, the law regarding use of protective force would apply.]

The HAWJIC self-defense instruction appears to be incorrect in suggesting, in the first paragraph, that offenses involving a reckless state of mind should not be listed as being subject to the defense. The trial court obviously did not heed this suggestion because it identified third degree assault, an offense which can be committed recklessly, *see* Hawaii Revised Statutes (HRS) § 707–712(1)(a) (1993), as the charge to which the defense applied.

4. The trial court, with the agreement of the parties, also modified the HAWJIC Instruction No. 7.01 for self-defense to exclude the provisions relating to the use of deadly force and made other changes not material to this appeal. The modified instruction given by the trial court provided as follows:

Justifiable use of force—commonly known as self-defense—is a defense to the charge of *Assault in the Third Degree*. The burden is on the prosecution to prove beyond a reasonable doubt that the force used by the defendant was not justifiable. If the prosecution does not meet its burden, then you must find the defendant *not guilty*.

The use of force upon or toward another person is justified when a person reasonably believes that such force is immediately necessary to protect himself on the present occasion against the use of unlawful force by the other person or other persons.

The reasonableness of the defendant's belief that the use of such protective force was immediately necessary shall be determined from the viewpoint of a reasonable person in the defendant's position under the circumstances of which the defendant was aware or as the defendant reasonably believed them to be.

Force means any bodily impact, restraint, or confinement, or the threat thereof.

Unlawful force means force which is used without the consent of the person against whom it is directed and the use of which would constitute an unjustifiable use of force.

Bodily injury means physical pain, illness, or any impairment of physical condition.

If and only if you find that the defendant was reckless in having a belief that he was justified in using self-protective force against another person, or that the defendant was reckless in acquiring or failing to acquire any knowledge or belief which was material to the justifiability

would have somehow forgotten that he was charged with both first degree terroristic threatening and third degree assault. Auld's agreement to modify the self-defense instruction so that it applied only to the third degree assault charges provides compelling evidence that he made a strategic choice to exclude the terroristic threatening charges from the self-defense instruction.

There are sound reasons why a trial court should not be required to give a self-defense instruction that a defendant, for strategic reasons, does not want. The defendant and his counsel are in a better position than the trial court to know how to most effectively defend against the charges. Our adversary system depends upon vigorous advocacy from each side to produce the fairest results. Forcing an unwanted self-defense instruction on a defendant would take control of the defense away from the defendant and impair the defendant's ability to present his or her defense.

In this case, the evidence supporting a claim of self-defense as to the terroristic threatening charges was tenuous at best. Auld was the aggressor in barging into another person's house, without permission, to confront Kiana Kalima, who Auld knew had no desire to speak to him. Auld took out a hunting knife with a six-inch blade and cut the phone line because he saw Adam Anglin talking on the phone. Although Auld claimed that the number of people around him made him feel uncomfortable, even by his own testimony, he took the knife out before anyone threatened or laid a hand on him. Moreover, Auld denied brandishing the knife as demonstrated by the prosecutor or swinging the knife at anyone. He testified that he put the knife away when asked to do so.

Given the slim evidence of self-defense on the terroristic threatening charges, Auld may have concluded that a self-defense instruction would hurt his chances for acquittal on those charges. For example, Auld may have been concerned that the jury would attribute the

of his use of force against the other person, then the use of such self-protective force is unavailable as a defense to the offense of *Assault in the Third Degree.*

self-defense instruction to him and that this would hurt his credibility in light of the weak evidence of self-defense on the terroristic threatening charges. Auld may have felt that a self-defense instruction on the terroristic threatening charges would distract the jury's attention from his best defense, which was that he did not threaten anyone with the knife. *See United States v. Applegate,* 424 F.2d 1042, 1043 (9th Cir.1970). Because self-defense involves a defendant's actual or threatened use of force, Auld may also have felt a self-defense instruction on the terroristic threatening charges would undermine his defense that he did not use the knife in a threatening manner.

At its core, a trial is the search for the truth. *See Nix v. Whiteside,* 475 U.S. 157, 166, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986). The defendant knows whether he or she acted in self-defense. For the defense of self-defense to apply, the defendant must "believe[ ] that [the use of force against another person] is immediately necessary for the purpose of protecting himself [or herself] against the use of unlawful force by the other person on the present occasion." Hawaii Revised Statutes (HRS) § 703–304 (1993 & Supp.2006). A defendant's choice not to assert self-defense may be based on the defendant's knowledge of why he or she acted or what really happened. The trial court should not be forced to override a defendant's decision not to assert this defense, particularly where the evidence of self-defense, while sufficient to raise the defense, is marginal.

A rule requiring the court to give a self-defense instruction even if deliberately not requested by the defense would put the trial court in a difficult position and create the potential for manipulation. Under Hawai'i law, the basis for a self-defense instruction is established by evidence that fairly raises the defense no matter "how weak, unsatisfactory, or inconclusive" the testimony supporting the defense might be. *Irvin,* 53 Haw. at 120, 488 P.2d at 328. It is not always apparent that sufficient evidence for a self-defense instruc-

(Emphasis added).

tion has been introduced, especially where self-defense is not asserted as a theory of defense. The defense of self-defense is subject to several conditions and exceptions that, depending on the circumstances, may make it difficult for a court to determine whether sufficient evidence has been presented to invoke the defense. *See* HRS § 703–304. An unconditional rule requiring the court to always give a self-defense instruction, whether requested or not, would create a trap for the unwary.

Such a rule would also create opportunities and incentives for manipulation. In cases where weak but sufficient evidence for a self-defense instruction had been presented, a defendant who had plausible defenses on other grounds would have an incentive to induce the trial court to omit a self-defense instruction. The defendant would then have two bites at the apple. The defendant could seek acquittal based on the plausible defenses and, if convicted, could demand a new trial based on the "erroneous" omission of the self-defense instruction. It seems odd to reward a defendant with a new trial based on a defense not asserted by the defendant because the jury, with the defendant's agreement, was not instructed on the unwanted defense. That, however, is the result urged by Auld in this appeal.

The Hawai'i appellate courts have not decided the precise issue presented by this appeal. In *State v. Haanio*, 94 Hawai'i 405, 16 P.3d 246 (2001), the Hawai'i Supreme Court held that a trial court must instruct the jury on included offenses rationally supported by the evidence regardless of the parties wishes. *Id.* at 413–15, 16 P.3d at 254–56. The court noted that allowing the parties to pursue an "all or nothing" strategy by foregoing instructions on provable lesser-included offenses "forecloses the determination of criminal liability where it may in fact exist" and "impairs the truth seeking function of the judicial system." *Id.* at 414–15, 16 P.3d at 255–56.

> Consequently, neither the prosecution nor the defense should be allowed, based on their trial strategy, to preclude the jury from considering guilt of a lesser offense included in the crime charged. To permit

this would force the jury to make an "all or nothing" choice between conviction of the crime charged or complete acquittal, thereby denying the jury the opportunity to decide whether the defendant is guilty of a lesser included offense established by the evidence.

*Id.* at 415, 16 P.3d at 256 (quoting *People v. Barton*, 12 Cal.4th 186, 47 Cal.Rptr.2d 569, 906 P.2d 531, 536 (1995)).

However, the question of whether the defendant should have a say in how to defend against the charges presented to the jury by forgoing a self-defense instruction is different from the question decided in *Haanio* of whether the defendant can prevent the jury from considering his or her guilt on lesser included offenses. Permitting a defendant to exercise a measure of strategic control over whether the jury is instructed on self-defense would not deprive the jury of the opportunity to consider the defendant's guilt on provable included offenses. It would simply allow the defendant to focus the jury's attention on the defense or defenses the defendant wants to assert in circumstances where the defendant believes a self-defense instruction would be detrimental to his or her case. Accordingly, *Haanio* is not dispositive of the issue presented in Auld's appeal.

In the context of ineffective assistance of counsel claims, the Hawai'i Supreme Court has recognized the authority of defense counsel to make strategic choices and has refrained from second-guessing those choices. *See Briones v. State*, 74 Haw. 442 463, 848 P.2d 966, 976 (1993) (stating that actions or omissions of counsel that had "an obvious tactical basis for *benefitting* the defendant's case will not be subject to further scrutiny"); *State v. Richie*, 88 Hawai'i 19, 39–40, 960 P.2d 1227, 1247–48 (1998) ("[M]atters presumably within the judgment of counsel, like *trial strategy*, will rarely be second-guessed by judicial hindsight." (internal quotation marks omitted)). The United States Court of Appeals for the Seventh Circuit has similarly held that "counsel's strategic choice to pursue one line [of defense] to the exclusion of others is rarely second-guessed on appeal." *United States v. Adamo*, 882 F.2d 1218, 1227 (7th Cir.1989).

The defendant and his or her counsel should be allowed to make strategic choices as to what defenses to pursue. I would hold, under the circumstances of this case, that the trial court had no duty to give and did not err in failing to give a self-defense instruction on the terroristic threatening charges which Auld did not request and apparently for strategic reasons did not want.

## II.

In any event, even assuming, *arguendo*, that the trial court erred in not giving the unrequested self-defense instruction as to the terroristic threatening charges, any such error was harmless beyond a reasonable doubt as to Count 5.[5] Auld was charged in Count 5 with terroristically threatening Adam Anglin (Adam) with a hunting kife.

As previously noted, the evidence that Auld pulled out the hunting knife in self-defense was very tenuous. Auld was trespassing when he entered the house and was clearly the aggressor. There was no evidence that Adam or anyone else at the house had assaulted or threatened to assault Auld before Auld took out the knife. The evidence, to the extent it existed, that Auld's threatened use of the knife was immediately necessary to protect himself against the unlawful use of force by Adam was weak. Adam denied threatening Auld or doing anything aggressive toward Auld. Adam testified, without contradiction, that he moved away from Auld and fled out the back door in response to Auld's pulling out the knife.

The trial court did give a self-defense instruction as to the third degree assault charges. Auld was charged with and found guilty of assaulting Salina Skylark Kansana (Count 2), Kiana Kalima (Count 3), and Liane Kalima (Count 4). The jury's rejection of Auld's self-defense claim as to the assault charges[6] demonstrates that any error in failing to include the terroristic threatening charges in the self-defense instruction did not contribute to Auld's terroristic threatening conviction on Count 5. Auld's brandishing of the knife and his assault of the three women were part of the same episode. Auld had a much stronger evidentiary basis for a self-defense claim with respect to the assault charges since he testified that after he put away the knife, the three women attacked him first and that he responded by defending himself with his bare hands. The jury's rejection of Auld's stronger self-defense claim with respect to the assault charges shows that the jury would necessarily have rejected a self-defense claim as to the terroristic threatening charges. The jury's guilty verdicts on the assault charges also demonstrate that the jury rejected Auld's version of what happened. Under these circumstances, there is no reasonable possibility that any error in failing to instruct on self-defense as to the terroristic threatening charges might have contributed to Auld's terroristic threatening conviction on Count 5. *See State v. White,* 92 Hawai'i 192, 198, 205, 990 P.2d 90, 96, 103 (1999).

## III.

For the foregoing reasons, I would affirm Auld's conviction on Count 5 and therefore respectfully dissent from the majority's decision to vacate the conviction on Count 5. I agree with the majority's decision to 1) vacate Auld's conviction on Count 1 and 2) affirm Auld's convictions on Counts 2, 3, and 4, which Auld does not challenge on appeal.

**5.** Since I agree with the majority that Count 1 must be vacated due to the inadequacy of the unanimity instruction as applied to Count 1, the discussion of harmless error will be confined to Count 5.

**6.** In special interrogatories, the jury also rejected Defendant–Appellant David William Kawika Auld's alternative contention that any assault he committed against the three women occurred during a mutual affray.